Thomas R. YOUNG, Defendant-Below, Appellant,

v.

STATE of Delaware, Plaintiff-Below, Appellee.

Supreme Court of Delaware.

Submitted June 14, 1979.

Decided Sept. 4, 1979.

Thomas J. Stumpf of the Law Firm of James C. Sabo, Georgetown, and Benjamin F. Shaw, III, Georgetown, for defendant-below, appellant.

James E. Liguori, Deputy Atty. Gen., Georgetown, for plaintiff-below, appellee.

Before HERRMANN, C. J., and McNEILLY and QUILLEN, JJ.

McNEILLY, Justice.

The defendant, Thomas R. Young, appeals his Superior Court jury convictions of murder in the first degree, possession of a deadly weapon during the commission of a felony, conspiracy in the second degree, and robbery in the first degree, all stemming from the stabbing murder of Benjamin F. Snyder at the victim's general store and residence in Milton. The defendant contends that the Trial Judge erred in failing to grant his request for trial by Court; in conducting an inadequate voir dire of the jury panel; in admitting certain prejudicial evidence; in permitting improper cross-examination of defendant; and in failing to grant defendant's motion for judgment of acquittal because of the insufficiency of the State's evidence. We consider each issue seriatim.

I

At arraignment defendant entered a plea of not guilty as to all charges and requested trial by jury. During a pretrial conference

defendant expressed his desire through counsel, to waive his right to trial by jury and to be tried by the Court. The State objected and the Trial Judge denied defendant's request under Superior Court Criminal Rule 23(a):

"(a) *Trial by Jury.* Cases required to be tried by jury shall be so tried unless the defendant waives a jury trial in writing with the approval of the Court and the consent of the State."

There is no record of the pretrial conference, but for purposes of this argument we assume the basis for defendant's request was the possibility of prejudicial media publicity making the selection of an impartial jury unlikely. Defendant asserts that this is sufficient reason to afford him the right to trial by Court as suggested in the following dictum from *Singer v. United States*, 380 U.S. 24, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965):

"We need not determine in this case whether there might be some circumstances where a defendant's reasons for wanting to be tried by a judge alone are so compelling that the Government's insistence on trial by jury would result in the denial to a defendant of an impartial trial. Petitioner argues that there might arise situations where 'passion, prejudice . . . public feeling' or some other factor may render impossible or unlikely an impartial trial by jury. However, since petitioner gave no reason for wanting to forego jury trial other than to save time, this is not such a case, and petitioner does not claim that it is." 85 S.Ct., at 791.

 Under the circumstances of this case we cannot agree that a bald assertion of a constitutional right to a Court trial, based upon a casually expressed "desire" at an unreported pretrial conference, required the Trial Court's affirmative ruling on that "desire". This Court in *Longoria v. State*, Del.Supr., 168 A.2d 695, appeal dismissed 368 U.S. 10, 82 S.Ct. 18, 7 L.Ed.2d 18 (1961) has upheld the constitutionality of Rule 23(a), which requires the State's consent to a non-jury trial, citing *Patton v. United States*, 281 U.S. 276, 50 S.Ct. 253, 74 L.Ed. 854 (1930). In *Patton* the Court stated:

"In affirming the power of the defendant in any criminal case to waive a trial by a constitutional jury and submit to trial by a jury of less than twelve persons, or by the court, we do not mean to hold that the waiver must be put into effect at all events. That perhaps sufficiently appears already. Trial by jury is the normal and, with occasional exceptions, the preferable mode of disposing of issues of fact in criminal cases above the grade of petty offenses. In such cases the value and appropriateness of jury trial have been established by long experience, and are not now to be denied. Not only must the right of the accused to a trial by a constitutional jury be jealously preserved, but the maintenance of the jury as a fact-finding body in criminal cases is of such importance and has such a place in our traditions, that, before any waiver can become effective, the consent of government counsel and the sanction of the court must be had, in addition to the express and intelligent consent of the defendant. And the duty of the trial court in that regard is not to be discharged as a mere matter of rote, but with sound and advised discretion, with an eye to avoid unreasonable or undue departures from that mode of trial or from any of the essential elements thereof, and with a caution increasing in degree as the offenses dealt with increase in gravity." 50 S.Ct., at 263.

Referring to *Patton v. United States, supra*, the Court in *Singer v. United States, supra*, said:

Thus, there is no federally recognized right to a criminal trial before a judge sitting alone, but a defendant can, as was held in *Patton*, in some instances waive his right to a trial by jury. The question remains whether the effectiveness of this waiver can be conditioned upon the consent of the prosecuting attorney and the trial judge.

The ability to waive a constitutional right does not ordinarily carry with it the

right to insist upon the opposite of that right."

\* \* \* \* \* \*

"A defendant's only constitutional right concerning the method of trial is to an impartial trial by jury. We find no constitutional impediment to conditioning a waiver of this right on the consent of the prosecuting attorney and the trial judge when, if either refuses to consent, the result is simply that the defendant is subject to an impartial trial by jury—the very thing that the Constitution guarantees him. The Constitution recognizes an adversary system as the proper method of determining guilt, and the Government, as a litigant, has a legitimate interest in seeing that cases in which it believes a conviction is warranted are tried before the tribunal which the Constitution regards as most likely to produce a fair result." 85 S.Ct., at 790.

█ There is nothing in the record of this case to furnish a factual basis for the granting of trial by Court over the State's objection.

## II

Defendant argues that the Trial Court's voir dire of the jury panel was conducted in such a manner as to substantially prejudice him in the selection of an impartial and unbiased jury. The substance of the questions themselves are not objected to, apparently because counsel for defendant were allowed substantial imput into the preparation of the questions.

The Trial Judge made the following introductory remarks to the jury panel:

"I am going to be asking you a series of questions. In fact, there are a great number of questions. At the conclusion of all the questions, I will ask any of you who have a response to a particular question or questions to merely raise your hand so we have some idea how many of you will be responding, and then we will take it from there."

The Trial Judge then asked the jurors thirty-eight questions, two of which specifi-

cally requested if any members of the panel were acquainted with any of eighty-six named people. At the conclusion of the questions the Trial Judge requested the panel, "all those who have a response to one or more of the questions which I have asked, please raise your hand." Those panel members who raised their hands were then questioned individually, apart from the other members of the jury panel.

Defendant contends that the Judge should have either: (1) questioned each panel member individually, or, at the least, (2) recorded the name of each panel member who had an affirmative response to a question after each question was posed to the panel collectively. Otherwise, it is inconceivable that each juror could recollect all his responses to the thirty-eight questions, including the eighty-six mentioned names.

"The purpose of *voir dire* examination of prospective jurors is to give the trial judge sufficient information to determine whether or not a prospective juror is qualified. In addition, it aids the State and the defendant by eliciting facts upon which they can exercise intelligently rights to peremptory challenges." *Parson v. State*, Del.Supr., 275 A.2d 777, 780–1 (1971).

"The extent of a *voir dire* examination of prospective jurors and the questions to be permitted lie within the broad discretion of the Trial Court, subject to the essential demands of fairness." (citations omitted) *Wright v. State*, Del.Supr., 374 A.2d 824, 829 (1977).

The need for a searching voir dire to ensure impartiality is reflected by the following general conclusions about jurors' behavior: (1) that "the processes by which (jurors') beliefs are found and adhered to, and their effect on perception, appear to take place to a large extent below the level of consciousness" and (2) whether they are conscious of it or not, "jurors often fail to be truthful on matters of possible prejudice." A.B.A. Standards Relating to Fair Trial and Free Press, *General Commentary* at 58, 64.

■ Consequently, the Trial Judge should not merely go through the form of obtaining jurors' assurances of impartiality, but rather, he should conduct an examination designed to elicit answers which provide an objective basis for his evaluation. *Silverthorne v. United States*, 9 Cir., 400 F.2d 627 (1968), *later appeal*, 430 F.2d 675 (1970), *cert. denied*, 400 U.S. 1022, 91 S.Ct. 585, 27 L.Ed.2d 633 (1971).

■ To provide such an objective basis, it seems that regardless whether collective or individual voir dire is used, the Court should adopt " . . . such plan as will assure a response to *each* question from each individual juror." *Padgett v. Padgett*, Ga.App., 63 Ga.App. 70, 10 S.E.2d 127, 128 (1940). *See Government of Virgin Islands v. Hendricks*, 3 Cir., 476 F.2d 776, 778 n.3 (1973) (Responses given by jury panel members immediately after each collective question by the Court).

In the instant case, the jury panel consisted of fifty-eight members, forty-five of whom were individually questioned. Of the twelve jury members, ten were questioned individually. Of the four alternates, one was questioned individually.

Of the ten jurors who were questioned individually, only one was challenged for cause, which challenge the Judge denied. The grounds for that challenge were that the juror was a former alderman, that he had heard of the case from various police officers whose names the juror could not remember, and that one of the testifying officers might possibly have given him the information, although he further testified that he had not followed the media reports and could decide the case on the facts presented at trial.

Defendant's contention that the panel members could not recall questions is, to a certain extent, supported by the record. To illustrate the panel members' "forgetfulness", the following example is helpful.

None of the first twelve panel members individually questioned was specifically asked about pretrial publicity and none volunteered whether he or she had had any such exposure. Beginning with the questioning of the thirteenth panel member the Trial Judge, apparently at the request of counsel, specifically asked the panel member about the nature and extent of her exposure to pretrial publicity. Upon direct questioning by the Trial Judge, the panel member admitted having read about the case in the newspaper.

Most, but not all, panel members who were subsequently questioned individually were asked about their exposure to pretrial publicity. All who were asked had either heard or read of the case, although none was disqualified for having any preconceived opinion concerning the outcome of the case. The few panel members who were questioned individually, but not specifically asked about exposure to pretrial publicity, gave no indication of any exposure.

After individually questioning the fifteenth panel member, the Court reassembled the complete panel and again asked them collectively the questions concerning exposure to pretrial publicity. Two of the first twelve panel members who were questioned individually returned after the second round of collective questioning and indicated that they had been exposed to pretrial publicity, but the Court received assurances of their impartiality. The Court then continued its individual questioning.

In the final analysis, seven of the twelve sitting jurors indicated that they had read or heard about the case. Of the other five, two had not been questioned individually and three, who had been questioned individually, had not been individually asked about their exposure to pretrial publicity. Because the Trial Judge twice asked the entire panel about exposure to pretrial publicity, we must conclude that those five actually had no exposure to pretrial publicity.

■ It is also important to note that the Trial Judge consistently asked counsel if they had additional questions, thus providing counsel with the opportunity to probe for other potential prejudices which might have been critical to the case, e. g., potential racial prejudice because defendant was

black and the victim was white. Defense counsel never made use of that opportunity nor did they register any objection during voir dire to the manner in which voir dire was conducted. With nothing in the record appearing to the contrary, we must conclude that defense counsel was satisfied with the jury panel. Failure to object is " . . . an action we cannot assume to be purely formal when there was still opportunity to challenge for cause." *Woodmansee v. Stoneman*, Vt.Supr., 133 Vt. 383, 344 A.2d 26, 30 (1975).

Although the voir dire may have been more effective if handled in a different manner, any prejudice which defendant may have suffered is more speculative than real. In any event, defense counsel waived any objection in light of the opportunity for additional questioning which the Trial Judge provided and their failure to take advantage of that opportunity. Absent specific objections made at the time, voir dire issues raised on appeal ordinarily will not be noticed. *Aldridge v. United States*, 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931).

Under the circumstances, it appears that the judge did not abuse his discretion in conducting voir dire.

"Unless a trial judge clearly has erred in his estimation of the action needed to uncover and prevent prejudice from pre-trial publicity, an appellate court should not intervene and impose its estimate. The court closest to the situation can best evaluate the proper way to walk the difficult line between a vigorous voir dire to determine any possible bias and avoidance of creating bias by specific questions which add 'fuel to the flames' in suggesting the presence of controversial issues." *United States v. Polizzi*, 9 Cir., 500 F.2d 856, 880 (1974), cert. denied 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975).[1]

## III

Because defendant had stipulated that the victim had been stabbed repeatedly and died as a result of the blood loss, it is argued that the four small (3⅛″ × 3⅛″) color photographs of the victim, admitted into evidence over defendant's objection, had no probative value, and were merely inflammatory and prejudicial. The first photograph shows the victim as he was brought into the morgue, fully clothed, his hands tied, a knife protruding from the middle of his chest, and his head wrapped in bloody towels. The next photograph is a side view depicting the same thing, but providing a clearer view of the butcher knife and the angle of its penetration. The third photograph, depicting the victim's naked body from the waist up, illustrates indentations around the right wrist, apparently the result of the victim's hands being tied. The fourth photograph depicts the left facial and neck area showing multiple stab wounds. These pictures are indeed "horrible and grotesque", as claimed by the defense. But their probative value to charges of murder in the first degree and robbery in the first degree is obvious. The State Medical Examiner testified at length from a schematic drawing as to the extent and location of the wounds. But the oral testimony of the Medical Examiner in this case could not and did not substitute for the photographs' characterization of the deliberate and vicious nature of the murder and robbery of the helplessly bound victim.

The Trial Judge has broad discretion in admitting or rejecting photographs depicting a victim's wounds. Absent an abuse of that discretion the Trial Judge's ruling will be sustained. *Shantz v. State*, Del.Supr., 344 A.2d 245 (1975). We find no abuse of discretion in this case in the Trial Judge's admitting the four color photographs of the victim. See *Tucker v.*

---

1. While we find no prejudicial error, we take the occasion to express disapproval of the collective *voir dire* procedure adopted here as a practice likely to create confusion and error. That is not to say we disapprove of the collective *voir dire* procedure generally. But in those cases involving length and complex *voir dire* the Court must adopt a plan of questioning the prospective jurors in a manner which will assure a full understanding and response by each member of the panel affected.

*State*, Del.Supr., 187 A.2d 429 (1963); *Wisniewski v. State*, Del.Supr., 138 A.2d 333 (1957).

## IV

■ Defendant next argues that the Trial Judge erred in permitting the recross-examination of Dr. Huxtable, defendant's medical expert witness, who testified that defendant appeared to be telling the truth during a sodium amytal examination which he had conducted at defendant's request. In conducting the questioned recross-examination the State was attempting to show that the defendant had three months' notice of the sodium amytal examination and could have prepared himself sufficiently to avoid detection of deception during the examination. Defendant objected to this line of questioning, and the Trial Judge sustained the objection conditioned upon the State's laying a proper foundation that the defendant did, in fact, have such notice. Subsequently a side bar conference was held which unfortunately was not reported and made a matter of record. However, although defendant objects to the State's informal offer of proof as constituting a proper foundation, it is not denied by defendant that the State produced a copy of a letter from the Deputy Attorney General to Dr. Huxtable[2] with copies to defendant's attorney at that time and to defendant, expressing defendant's desire to undergo sodium amytal testing. Upon production of that letter the Trial Judge was satisfied and permitted the State to continue with the line of questioning objected to. We are satisfied that the Trial Judge properly exercised his discretion in admitting the evidence on the State's recross-examination of Dr. Huxtable on the strength of the uncontroverted offer of proof made by the State at side bar.

## V

■ Defendant argues that the Trial Judge erred by permitting the State to cross-examine defendant about a statement made by a co-defendant which implicated defendant and which had been ruled inadmissible in an earlier pre-trial proceeding. The defendant claims that the use of this inadmissible evidence in cross-examination was prejudicial, permitting the jury to draw an inference from matters not in evidence that there was another witness implicating the defendant whose testimony they had not heard, and permitting the jury to speculate on what that testimony was.

The record is clear, however, that it was defendant who opened the door to the State's questioning and he cannot now object. The following is the pertinent colloquy between the prosecutor and defendant on cross-examination:

"Q. What about George Lee Reynolds? How well do you know George?

A. I told you. I used to cut his hair. I used to cut his family's hair in Milford.

Q. And you were surprised when Mr. Burke told you about George Lee Reynolds?

A. No, because I had rumors.

Q. What rumors?

A. George had put us in here, had told the detective we was involved."

Following that exchange the State pursued the matter:

"Q. George Lee Reynolds allegedly states you are involved.

A. That is what I was told.

MR. STUMPF: This is getting very repetitive at this stage. I believe this is the third time we are going into this.

THE COURT: Come to side bar.

(Side bar conference not reported.)

BY MR. LIGUORI:

Q. So George Lee Reynolds implicates you.

A. This is what I was told.

Q. Who told you that?

---

2. Dr. Richard T. Huxtable, Jr. was a psychiatrist regularly employed by the State of Delaware at the State Hospital.

A. First time directly told me? Sam Burke.

Q. Who else told you that?

A. Hey, that's the talk around the jail when I was in there before.

Q. Now, you were in the jail and you heard about George Lee Reynolds implicating you.

A. Yes.

Q. Now, my understanding from your direct examination was the first time you heard about it was the day you were released?

A. Nope.

Q. That isn't what you said?

A. I heard rumors before then. The first time I was told directly was Sam Burke told me in his office and my attorney was present."

### VI

■ Defendant contends the Trial Judge erred by failing to grant his motion for judgment of acquittal made at the conclusion of the State's case in chief, and his motion for judgment of acquittal notwithstanding the jury's verdict. This contention is without merit.

After viewing the evidence in the light most favorable to the prosecution a rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt. *Jackson v. Virginia*, —— U.S. ——, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

The victim's wife testified to the amount of money missing. Miles Cuffee, a friend of defendant for nearly three years, testified that on the day before the robbery and murder the defendant solicited Cuffee to join in a "rip-off". Cuffee further testified that on the following day when he arrived home from a shopping trip in Dover he found a burned shirt in his sink and some ashes on the floor. He further testified that defendant arrived in Charlie Thomas' car wearing what appeared to be a blood stained tee shirt; that defendant told him he had "ripped off old man Snyder"; and that he had been to Cuffee's home earlier. Cuffee also stated that defendant informed him of the details of the "rip-off", i. e., he hit the victim with a can of baked beans, dragged him into the back and tied him up. These details could not be known by a non-participant and actually piece together the circumstantial evidence found by the Delaware State Police at the scene. Additionally, Charles Thomas identified a photograph of defendant as the man he had taken from Milton to Milford in his car for two dollars on the afternoon of the robbery-murder. Thomas' testimony at trial was weak, but was sufficient for the jury's consideration.

Defendant's defense was alibi, and the Trial Judge quite properly left the determination of guilt or innocence to the jury.

\* \* \* \* \* \*

Affirmed.