George W. GRAY, James W. Waller,
Defendants Below, Appellants,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Supreme Court of Delaware.

Submitted April 21, 1981.

Decided Sept. 16, 1981.

As Corrected Feb. 26, 1982.

Lawrence B. Steele, III (argued), George-town, for defendant below, appellant George W. Gray.

Larry W. Fifer (argued) and Douglas W. Lundblad, of Schmittinger & Rodriguez, P.A., Dover, for defendant below, appellant James W. Waller.

Merritt Burke, III (argued), Deputy Atty. Gen., Georgetown, for plaintiff below, appellee.

Before HERRMANN, C. J., and DUFFY and QUILLEN, JJ.

**HERRMANN, Chief Justice:**

The defendants George W. Gray and James W. Waller were both convicted of Murder in the First Degree, 11 *Del.C.* § 636(a)(6),[1] and Kidnapping in the First Degree, 11 *Del.C.* § 783A(3).[2] Waller was also convicted of Robbery in the First Degree, 11 *Del.C.* § 832, and Gray was also convicted of Robbery in the Second Degree, 11 *Del.C.* § 831.[3] The charges arose from the disappearance and death of John W. Horstman.

## I.

According to the State's evidence the basic facts are as follows: At about 10:00 a. m. on August 6, 1977, Horstman, age 67, left his home in Laurel in his pickup truck. He did not return. The following morning, Horstman's wife reported her husband's absence to the State Police. The matter was filed as a missing persons complaint and an investigation was begun. During the following week, Horstman's abandoned truck was found in Salisbury, Maryland, a few miles south of Laurel.

Six weeks after Horstman's disappearance, a skeletonized body was found approximately 7 miles southwest of Laurel in

---

1. 11 *Del.C.* § 636(a)(6) provides in pertinent part:

"§ 636. Murder in the first degree; class A felony.

"(a) A person is guilty of murder in the first degree when:

\* \* \* \* \* \*

"(6) He, with criminal negligence, causes the death of another person in the course of and in furtherance of the commission or attempted commission of rape, kidnapping, arson in the first degree, robbery in the first degree, or immediate flight therefrom; \* \*."

2. 11 *Del.C.* § 783A(3) provides:

"§ 783A. Kidnapping in the first degree; class A felony.

"A person is guilty of kidnapping in the first degree when he unlawfully restrains another person with any of the following purposes:

\* \* \* \* \* \*

"(3) To facilitate the commission of any felony or flight thereafter; \* \* \*

"and the actor does not voluntarily release the victim alive, unharmed and in a safe place prior to trial."

3. "§ 831. Robbery in the second degree; class D felony.

"A person is guilty of robbery in the second degree when, in the course of committing theft, he uses or threatens the immediate use of force upon another person with intent to:

"(1) Prevent or overcome resistance to the taking of the property or to the retention thereof immediately after the taking; or

"(2) Compel the owner of the property or another person to deliver up the property or to engage in other conduct which aids in the commission of the theft."

\* \* \* \* \* \*

"§ 832. Robbery in the first degree.

"(a) A person is guilty of robbery in the first degree when he commits the crime of robbery in the second degree and when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime:

"(1) Causes physical injury to any person who is not a participant in the crime; \* \* \*."

a heavily wooded area. The remains were in two parts: the lower torso in a pair of pants and the upper torso in a shirt. The remains were approximately 13 feet from a maple tree 6 inches in diameter, around which were tied certain pieces of clothing. Lying in the area immediately adjacent to the tree were a man's belt and several other pieces of clothing. At the base of the tree was a dental plate upon which was found the inscription: "J. Horstman."

The remains were identified as being those of John W. Horstman.

* * * *

Five persons were arrested in connection with the disappearance and death of Horstman: the defendant James Waller, age 33; the defendant George Gray, age 35; Shirley Pryor, age 33, the girlfriend of James Waller; Eleanor Waller, the sister of James Waller; and Bobby Anderson, age 15. All were charged with Robbery, Kidnapping, and Murder, all in the First Degree. Pryor, Eleanor Waller and Anderson eventually entered guilty pleas to lesser offenses.[4] Defendants Gray and Waller were tried together in Superior Court before a jury.

The trial of Gray and Waller lasted two weeks. Signed statements concerning the involvement of all five persons with Horstman had been obtained by the State Police from Waller, Pryor, and Anderson; these statements were admitted into evidence at trial. Defendant Gray had given an oral statement to the State Police; this was testified to by the interviewing police officer at trial. Furthermore, Anderson, Pryor, and Gray each testified extensively at trial. From this evidence there emerged the following account of the events which transpired on August 6:

Not long after leaving his home that morning, Horstman arrived in his truck at a place called "Lookout Mountain"—a corner-lot in a section of Laurel where people often gathered to drink. Gray, James Waller, Pryor, Eleanor Waller, and Anderson were present; each, with the exception of Anderson, had been drinking. A person familiar with Horstman introduced him to Gray and Waller; Gray, in turn, introduced Horstman to the other three. At some point thereafter, James Waller solicited Horstman for sex with his sister Eleanor; Horstman was receptive to the idea. The six then left "Lookout Mountain" in Horstman's truck. Horstman drove; Eleanor Waller sat in the middle of the front seat; James Waller sat on the passenger side; and Gray, Pryor, and Anderson sat in the back of the truck under an enclosed "camper" section.

They were driving southwest from Laurel (two brief stops were made, including one at a liquor store) when Eleanor Waller told Horstman that she had to leave the truck momentarily—this being an agreed-upon signal between her and defendant Waller that Horstman had money and they should attempt to rob him. Horstman stopped the truck, Waller exited the passenger-side, went around the truck, opened the driver's-side door, and instructed Horstman to move over. When the elderly man refused, Waller struck him twice on the head, causing some bleeding. Waller then climbed into the driver's seat and drove the truck over a nearby field road into a wooded area where he stopped and ordered Horstman to get out of the truck. The others exited as well. Horstman pleaded, "Don't hurt me. I will give you anything you want, but please don't hurt me." While Gray held Horstman, Waller went through his pockets, found his wallet, and removed the money. Waller instructed Gray and Anderson to wipe-down the truck to remove any fingerprints. Waller then proceeded into the woods with Horstman, accompanied by Eleanor Waller and Pryor.

---

4. Pryor and Eleanor Waller entered pleas to Murder in the Second Degree. The remaining charges against them were *nolle prosequied* by the State.

 Anderson's case was transferred to the Family Court where he entered a plea of "guilty" to an Act of Delinquency, Murder in the Second Degree. The remaining charges against him were *nolle prosequied* and he was committed to the Bureau of Juvenile Corrections.

After entering some distance into the woods, Waller directed Horstman to kneel against a tree with his back to it. Horstman's feet were tied on the other side of the tree by the ankles with a belt. His hands were tied in the front of him at the wrists with another belt and his elbows pulled back at his sides and a shirt looped through them and around the tree. A gag was placed in his mouth and tied behind his head; and a shirt covering his head and face was tied around the tree. Gray and Anderson, summoned from the truck by Waller, provided some of the clothing used to restrain Horstman. At the tree, Gray reportedly struck Horstman twice. The five then walked away from the tree; as they did so, Horstman could be heard, through the gag, either moaning or trying to say something to them.

The five returned to the truck and, with Waller driving, left the wooded area. Waller drove to an area near Portsville, Delaware, stopped the truck, and instructed Anderson and Gray to remove certain items from the truck and hide them in the woods. As they did so, the truck sped off without them. Waller drove the truck, along with Eleanor Waller and Pryor, to Salisbury, Maryland; the truck was left there and the three boarded a bus to Philadelphia. Meanwhile, Gray and Anderson walked back the several miles to Laurel and returned to "Lookout Mountain," where Gray continued the drinking he started many hours before.

\* \* \*

A Superior Court jury found the defendants Gray and Waller guilty of the charges indicated. The defendants challenge their convictions on numerous grounds which will be considered *seriatim*, with additional facts being supplied as necessary.

## II.

The defendants first contend that the Trial Court committed prejudicial error in its ruling upon certain discovery matters. According to the defendants, the prosecutor in this case originally agreed with defense counsel to an "open door" discovery policy with respect to evidence in the control of the State. Despite this agreement, say the defendants, the State failed to provide certain items deemed material to the defense, viz.: (1) a dirt sample taken from the base of the tree where the remains of Horstman were found; (2) a bark sample from that tree; and (3) a set of color photographs taken at the scene the day the remains were discovered. The defendants did not become aware of the existence of the dirt and bark samples (and, significantly, the lack of any scientific tests performed upon them) until after the trial had started; and the photographs, despite a specific request therefor, were not made available to the defendants until four days prior to the start of trial. The defendants argue that the Trial Court's failure to order discovery as originally agreed to by the State, along with the introduction into evidence of the above items, severely prejudiced the defendants' right to a fair trial and to adequate trial preparation.

As indicated by the defendants, the State had agreed to a liberal discovery policy in this case. It also appears, however, that a misunderstanding arose between the prosecutor and defense counsel as to the extent of that agreement. The Trial Court ordered that the usual discovery rules would apply, notwithstanding any previous agreement. Thus the Court denied defendant Gray's request that the State be made to abide by its alleged prior representations and ruled that the defendants would be granted only such discovery as is specifically allowed by Superior Court Criminal Rule 16.[5]

---

5. Superior Court Criminal Rule 16 provides in pertinent part:

"Rule 16. Discovery and Inspection.

\* \* \* \* \* \*

"(b) Other Books, Papers, Documents or Tangible Objects. The defendant may serve upon the Attorney General a request to permit the defendant or someone acting on his behalf to inspect and copy or photograph designated books, papers, documents, tangible objects, buildings or places, copies or portions thereof which are within the possession, custody or control of the State, upon a showing that the items sought may be material to the prepara-

■ We agree with the Trial Court's ruling. Rule 16, pertaining to evidentiary discovery in criminal cases, makes no provision for obtaining evidence "as promised" by the State. And, although the resultant nullification of the alleged prior arrangement undoubtedly caused the defendants some inconvenience, we are not able to say that the defendants were prejudiced thereby. The Court made its ruling over 5 months before trial, leaving ample time for the defendants to conform to the requisite discovery processes under Rule 16.

■ As to the dirt and bark samples specifically objected to, we conclude that the defendants were not entitled to them under Rule 16. The Rule provides for the discovery of tangible items if material and "designated." Because the defendants did not specifically designate the dirt and bark samples in their Motion for Discovery, they were not entitled to the pretrial production of the samples. See *State v. Traekner*, Del.Super., 314 A.2d 202 (1973).

■ Defendant, Gray, argues that if items of evidence are unknown, a defendant cannot "designate" them in his Motion for Discovery and Inspection. While as a general proposition that argument may be true, defendant was not without relief. Specifically, no post-trial application had been made to examine the soil and bark samples in order to determine their significance. Furthermore, defendant failed to request a continuance of the trial, on the basis of surprise or other reason, for the purpose of obtaining an analysis of the samples. Since no analysis was performed either by the State or by the defendants, we can only speculate as to the significance of the samples. A jury verdict will not be reversed on the basis of mere speculation where, as here, the verdict has sufficient evidentiary basis to support it.

\* \* \*

■ The color photographs objected to present a more troublesome issue. Pursuant to defendant Gray's Motion for Discovery, the Trial Court on February 21, 1978 ordered production of any photographs of "the alleged crime scene," which would include the photographs in question. Despite a formal request by defense counsel for the photographs on May 2, 1978, they were not produced until Friday, July 21, 1978—three days before the scheduled trial date.

We find that the delay in producing the color photographs did not unduly prejudice the defendants. When the defense objection to the photographs was presented, the Trial Court—instantly concerned with the possibility of prejudice—conducted an *in camera* hearing as to why the photos were important to the defendants, and then granted defense counsel's request for a one-day recess of the trial so that defense counsel would have time to utilize the photographs. The Court also proposed an additional day's continuance if necessary. Defense counsel expressed satisfaction with the one-day recess. Accordingly, defendant's argument that there was insufficient time to consider the significance of the photos is without merit. Furthermore, because the requested recess was granted to the defendants, and no further objection or application was made at the time, we find no prejudicial error in the Trial Court's admission of the photographs into evidence.

In sum, we find no reversible error in the Trial Court's rulings with regard to the discovery and introduction into evidence of the bark sample, the dirt sample, or the color photographs.

### III.

The defendants allege that the Trial Court abused its discretion in denying each defendant's Motion to Sever.

tion of his defense and that the request is reasonable. This subdivision does not authorize the discovery or inspection of reports, memoranda, or other internal State documents made by agents in connection with the investigation or prosecution of the case, except as provided in subdivision (a) of this rule, or of statements made by State witnesses or prospective State witnesses (other than the defendant or a co-defendant) to agents of the State."

The parties agree that the controlling law upon this issue is found in *Jenkins v. State*, Del.Supr., 230 A.2d 262 (1967), aff'd, 395 U.S. 213, 89 S.Ct. 1677, 23 L.Ed.2d 253 (1969), rehearing denied, 396 U.S. 995, 90 S.Ct. 469, 24 L.Ed.2d 460 (1969), where it was held:

"Ordinarily, an abuse of discretion will not arise from the mere fact that the confession or admission of a co-defendant, implicating the moving defendant and not admissible against him, will be introduced at the joint trial. Some other factor must be present, such as: (1) absence of other substantial, competent evidence of the movant's guilt, e. g., *Burton v. State*, supra; [Del.Supr., 1 Storey 546, 149 A.2d 337 (1959)] (2) antagonistic defenses as between the co-defendant and the movant, e. g., *People v. Barbaro*, 395 Ill. 264, 69 N.E.2d 692 (1946); and (3) difficulty of segregating the evidence as between the co-defendant and the movant, e. g., *Day v. State*, 196 Md. 384, 76 A.2d 729 (1950)."

230 A.2d at 273. Both defendants cite *Jenkins* in support of their position. Defendant Gray contends that, other than the statements by Waller, Pryor and Anderson, and physical evidence relative to them, there was no independent evidence against him. Defendant Waller contends that (1) there were antagonistic defenses between Waller and Gray and (2) a jury could not segregate the evidence against Waller from that against Gray and the others. We disagree; *Jenkins* is inapposite on the facts.

■ At the request of defense counsel, the Trial Court held an *in camera* proceeding to determine whether there was independent evidence against the defendants. A police officer testified at the hearing that, after being brought to Troop 5 for questioning, defendant Gray agreed to take the police to the area in the woods where Horstman was killed and where the items from Horstman's truck were hidden. The police officer further testified that, when questioned, Gray admitted that he went to the woods on August 6th with Horstman, Waller, Pryor, Eleanor Waller, and Anderson; that Horstman was robbed; that he

(Gray) lent his shirt to Waller to tie Horstman; and that he (Gray) helped Waller to tie Horstman to the tree. Clearly, the Trial Court was justified in concluding that there was independent evidence implicating Gray.

Contrary to defendant Waller's assertion, there were no antagonistic defenses in this case. Indeed, neither Gray nor Waller offered testimony which amounted to a defense at all. Furthermore, the Trial Court was correct in concluding that a jury would have little difficulty segregating the evidence as between defendants. The statements before the Court at the *in camera* hearing were remarkably consistent in their depiction of the events of August 6th, including the roles played by Gray and Waller.

■ We conclude that the Trial Court did not abuse its discretion in its denial of each defendant's Motion to Sever.

### IV.

Defendants contend that their own statements were improperly admitted into evidence in that the State failed to show that defendants had been given all of the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). We disagree.

In *Miranda*, the Supreme Court held that a criminal defendant is entitled to be informed of four specific rights prior to custodial interrogation:

"He must be warned prior to any questioning that he has the right to remain silent, that anything he says can and will be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."

384 U.S. at 479, 86 S.Ct. at 1630.

Both defendants concede that, prior to interrogation, they were given these four enumerated warnings. They assert, however, that there is a fifth *Miranda* right of which a defendant must be advised: namely that, if at any time during the interview

the defendant wishes to discontinue his statement, he has a right to do so.

■ Unquestionably, there is language in the *Miranda* decision to the effect that if "the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him." 384 U.S. at 445, 86 S.Ct. at 1612. But neither the U.S. Supreme Court nor this Court has ever held that the admissibility of a defendant's statement is dependent upon a showing that the defendant was expressly advised of this so-called fifth *Miranda* right.[6] The Courts of other states have considered whether *Miranda* required the giving of a fifth warning. Specifically, the Supreme Court of Connecticut has stated:

"The *Miranda* opinion does not conclude that explanation to an accused of this requirement for a police cutoff of questioning is an integral part of the required initial warning requisite to a valid waiver.... This requirement is directive only and is not a required warning under *Miranda* but is instead a caveat to the police that if an accused wishes to stop answering questions the police have a duty to close the interrogation.... Other jurisdictions which have considered whether *Miranda* required a special fifth warning of the accused's right to terminate the interrogation at any time have held that this warning is not required and that confessions taken in the absence of such a warning are not constitutionally tainted."

*State v. Cobbs*, Conn.Supr., 164 Conn. 402, 324 A.2d 234 at 244 (1973) citing *Green v. State*, Ala.App., 45 Ala.App. 549, 233 So.2d 243 (1970); *People v. Smith*, Mich.App., 30 Mich.App. 34, 186 N.W.2d 61 (1971); *State v. Carlton*, N.M.App., 83 N.M. 644, 495 P.2d 1091 (1972). See also *State v. Sherwood*, N.J.Super., 139 N.J.Super. 201, 353 A.2d 137 (1976).

■ We hold that the required *Miranda* warnings do not include express advice to the accused that he has the right to discontinue his statement if he chooses to do so. Accordingly, the defendants in the instant case were not deprived of their constitutional rights under *Miranda*.[7]

## V.

■ The defendants argue that they cannot be found guilty of Felony Murder under 11 *Del.C.* § 636(a)(6) because the underlying felony, Kidnapping, has undergone a statutory change. To elaborate:

Felony Murder is dealt with in 11 *Del.C.* § 636(a)(6) as follows:

"(a) A person is guilty of Murder in the First Degree when:

\* \* \* \* \* \*

"(6) He, with criminal negligence, causes the death of another person in the course of and in furtherance of the commission or attempted commission of rape, *kidnapping,* arson in the first degree, robbery in the first degree, or immediate flight therefrom." (Emphasis supplied)

That Statute was signed by the Governor and became law on March 29, 1974. 59 Del.Laws c. 284. At that time, a single crime of "Kidnapping" was provided by the Criminal Code as follows:

"§ 783. Kidnapping.

---

6. We note that Delaware police have occasionally given the fifth warning. See *Dorbolo v. State*, Del.Supr., 405 A.2d 106, 108 n. 1 (1979); *State v. Oakes*, Del.Supr., 373 A.2d 210, 213 n. 6 (1977). Neither *Dorbolo* nor *Oakes* requires the fifth *Miranda* warning. As a matter of policy, this added precaution may be preferable; but it is not constitutionally required. Uniformity in police policy in this regard is desirable. We recommend it.

7. As to defendant, Waller, the record clearly shows that he was, *in fact*, given the so-called "fifth" *Miranda* warning. The statement he signed recites the four required *Miranda* warnings. Immediately below those warnings is the statement, "If you do decide to answer any questions, with or without an attorney present, you may stop anytime during the questioning." In his signed statement, Waller indicated that all five "rights" had been explained to him, that he understood them and, with those rights in mind, he wished to make the statement. Accordingly, Waller's position on this point is without basis in fact.

"A person is guilty of kidnapping when he unlawfully restrains another person with any of the following purposes:

\* \* \* \* \* \*

"(3) To facilitate the commission of any felony or flight thereafter:

\* \* \* \* \* \*

Kidnapping is a class A felony unless the actor voluntarily releases the victim alive, unharmed and in a safe place prior to trial, in which case it is a class B felony."

On July 26, 1974, the above Kidnapping Statute was repealed and replaced by two separate statutory offenses: "Kidnapping in the First Degree," a class A felony, 11 Del.C. § 783A; and "Kidnapping in the Second Degree," a class B felony, 11 Del.C. § 783.[8] No change was made to the Murder Statute when the Kidnapping Statute was changed. The effect of the new Kidnapping Statute was to create two crimes out of the elements of what was originally one crime. Otherwise stated, the substance of §§ 783 and 783A taken together is identical to the old section 783. The distinction between First and Second Degree Kidnapping is whether the actor "voluntarily release[s] the victim alive, unharmed and in a safe place prior to trial."

The defendants make two related arguments: First, they contend that the State's indictment in the instant case is defective because it specified as the "included felony" under the Murder Statute the crime of "Kidnapping"—which is no longer a statutory offense in this State. Otherwise stated, the argument goes, the indictment is defective because the State failed to delineate the degree of Kidnapping under the current statutory provision. Second, the defendants contend that they cannot be convicted of Murder in the First Degree because that Statute is itself defective, in that the Felony Murder subsection refers to "kidnapping"—no longer a statutory offense in this State. As a result, the defendants assert, they have been deprived of the "notice" of prohibited conduct which is required by the Due Process Clause. Cf. United States v. Harriss, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954).

We find the defendant's arguments wholly untenable. Regardless of whether the defendant had intended to commit First or Second Degree Kidnapping at the outset, if the kidnapping victim's death is caused by the kidnapper "in the course of and in furtherance of the commission of the kidnapping," Felony-Murder has been committed under § 636(a)(6). That Statute, as it refers to "kidnapping," could not possibly fail "to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." United States v. Harriss, 347 U.S. at 617, 74 S.Ct. at 812.

Thus, we conclude that 11 Del.C. § 636(a)(6) is not constitutionally defective; that the indictments in the instant case were not defective; and that the Trial Court's denial of defendants' motion to strike the kidnapping count was correct.

## VI.

■ The defendants contend that the Trial Court's refusal to ask the prospective jurors certain requested questions during voir dire amounted to an abuse of discretion. Defendants suggest that the Trial Court should have conducted a more in-depth exploration of the jurors' potential biases, because this case involved several inflammatory aspects, i. e., the intense media coverage of the case; the difference in race between the victim Horstman (who was white) and the defendants (who are black); Waller's alleged solicitation of Horstman for sex with Eleanor Waller;

---

8. See text of § 783A, supra. The present § 783 provides in pertinent part as follows:

"A person is guilty of kidnapping in the second degree when he unlawfully restrains another person with any of the following purposes:

\* \* \* \* \* \*

"(3) To facilitate the commission of any felony or flight thereafter;

\* \* \* \* \* \*

"and the actor voluntarily releases the victim alive, unharmed and in a safe place prior to trial."

and the excessive consumption of alcoholic beverages by all parties involved.

This Court has defined the purpose of a *voir dire* examination of prospective jurors:

"As we have said, the purpose of such examination is solely to determine whether the prospective juror can render an impartial verdict upon the evidence and the law. Any questions which go beyond the ascertainment of this ultimate fact are entirely irrelevant to the *voir dire* examination and are properly struck by the trial judge." *Parson v. State*, Del. Supr., 275 A.2d 777, 783 (1971).

Further, the standard of review which this Court will employ in examining a trial court's *voir dire* was likewise set forth in *Parson, supra.*

"Any limitation imposed by the trial judge upon defendant's right to have prospective jurors questioned will not constitute reversible error unless the broad discretion reposed in the trial judge has been clearly abused to the prejudice of the defendant." 275 A.2d at 781.

In the instant case, 92 prospective jurors were asked 18 questions as a group; this was done twice, to insure that the members of the panel remembered the questions asked and their individual responses. Those giving an affirmative answer to any question were removed, and the remaining 29 were then questioned individually. Eleven jurors were selected from the group of 29; the remaining juror was picked from the group of 63.

The questions asked of the entire panel of 92 pertained to radio and newspaper publicity, personal knowledge of the case, familiarity with the defendants or victim, racial prejudice and other biases. Included were the following questions:

"Do you know anything about this case, either through your personal knowledge, discussion with anyone else, or the news media?"

"Do you know of any reason why you cannot give this case your undivided attention and render a fair and impartial verdict?"

"The defendants in this case are black. The alleged victim is white. Do you have any racial prejudice that would prevent you from rendering a fair and impartial verdict in this case?"

"Would you give the testimony of a police officer more credence than others merely because he is a police officer?"

In addition, the 12 members of the jury (all but one of whom did not answer affirmatively to the original 18 questions) were each interviewed individually in the presence of defense counsel, defendants and prosecutor. At that time they were again asked questions pertaining to bias, prejudice, media publicity, and the related issues.

In formulating the questions to be asked the prospective jurors, the Trial Court relied in part upon the lists of questions submitted by the defendants. Argument upon the proposed *voir dire* questions was presented in open court. We cannot say that the Trial Court abused its discretion in denying certain of the requested *voir dire* questions. Defendants submitted 83 questions to the Trial Court for use in *voir dire*. The Trial Judge ultimately used 23 questions. In reviewing the questions rejected by the Trial Court, we find that he could reasonably have found them to be redundant and "beyond the ascertainment of [the] ultimate fact" of impartiality of the prospective jurors and therefore irrelevant.

We note that the Trial Court appropriately and effectively adhered to this Court's caution in *Parson*, 275 A.2d at 783. There it was recommended that "examination of jurors at inordinate length and on questionable and irrelevant matters" be avoided. That recommendation was made by this Court in 1971 in recognition of "[t]he recent tendency to indulge in *voir dire* examination of a prolixity heretofore unknown in this State, with its trial delays and its adverse effect upon already heavily-burdened trial courts. . . ." Despite his paring-down of the questions submitted, the Trial Court did not merely go through the motions; rather he conducted "an examination designed to elicit answers which provide an objective basis for his evaluation." *Young v. State*, Del.Supr., 407 A.2d 517, 521 (1979), cert. denied 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 794 (1980).

Considering the procedures employed and the content of the questions actually put to the prospective jurors, we hold that no abuse of discretion appears.

"Unless a trial judge clearly has erred in his estimation of the action needed to uncover and prevent prejudice from pretrial publicity, an appellate court should not intervene and impose its estimate. The court closest to the situation can best evaluate the proper way to walk the difficult line between a vigorous voir dire (sic) to determine any possible bias and avoidance of creating bias by specific questions which add 'fuel to the flames' in suggesting the presence of controversial issues."

*Young v. State, supra,* at 522, quoting *United States v. Polizzi,* 9th Cir., 500 F.2d 856, 880 (1974), cert. denied 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975).

**9.** On cross-examination, Bobby Anderson was questioned by the attorney for Gray as follows:
"Question: Bobby, did you enter a plea in this particular incident in the Family Court?
"Answer: Yes, sir.
"Question: What did you plead guilty to?
"Answer: The second-degree murder charge."

\* \* \* \* \* \*

"Question: Bobby, did you agree with George Gray or James Waller to do anything to Mr. Horstman?

\* \* \* \* \* \*

"Answer: No sir."
The attorney for Waller questioned Anderson as follows:
"Question: When you gave this written statement to the authorities in Florida, isn't it true that at the time you were facing charges of murder in the first degree, kidnapping in the first degree and robbery in the first degree?
"Answer: Yes sir.
"Question: Did the fact that you were facing those charges have anything to do with the story you gave at that time?
"Answer: No, sir.
"Question: You have testified that after all this, you voluntarily entered a plea of guilty to murder in the second degree; is that correct?
"Answer: Yes sir."
On cross-examination, Shirley Pryor was questioned by the attorney for Gray as follows:
"Question: Shirley, you previously entered a plea of guilty to the charge of murder in the second degree in this case, didn't you?
"Answer: Yes, sir.

## VII.

The defendants argue that the Trial Court improperly limited their cross-examination of State's witnesses Pryor and Anderson—each a former co-defendant who had entered pleas to lesser charges. According to the defendants, the Trial Court erroneously restricted and refused cross-examination of Pryor and Anderson concerning the basis for their pleas, any benefits received from the State in exchange for the pleas, and other unspecified matters affecting credibility.

Upon examination of the record, we fail to discern any abuse of discretion on the part of the Trial Court. Indeed, it appears from the record that the defendants were given ample leeway to question Anderson and Pryor concerning their guilty pleas to reduced charges and related matters, with the hope of impeaching their credibility.[9]

"Question: You were originally charged with murder in the first degree, robbery in the first degree, and kidnapping in the first degree, the same as George Gray?
"Answer: Yes.
"Question: Shirley, do you have any hopes of leniency \* \* \* at your sentencing, or anything else, based upon your entry of that plea in this case?
"Answer: I still don't understand what you are talking about.
"Question: Do you have any hopes that it will go easy with you, because you entered a plea in this case, when you are sentenced?
"Answer: No.
"Question: Did Mr. Burke make any promises to you, either directly or through your attorney, in order to get you to plead in this case?
"Answer: No.
"Question: You did it of your own free will?
"Answer: Yes."

\* \* \* \* \* \*

"Question: Do you expect to receive any leniency or other benefit from the prosecution because of your testimony today?
"Answer: No.
"Question: Have you been sentenced yet for what you pled guilty to?
"Answer: No, I haven't."

\* \* \* \* \* \*

Accordingly, we find no merit in this argument.

## VIII.

The defendants object to the admission into evidence of a Timex watch belonging to the victim Horstman.

On September 21 (five days after the remains of Horstman were discovered), defendant James Waller was interviewed by the Delaware State Police at the Philadelphia Detention Center, where Waller was being held on unrelated charges. At that time, Waller signed an incriminating statement concerning the Horstman incident, and also signed a "Voluntary Consent to Search Without Warrant," consenting to a search of his belongings held by the Philadelphia authorities. The express purpose of the search was for the Timex watch which had been owned by Horstman and which Waller admitted to having taken. The Delaware police conducted the search and obtained the watch the following morning, September 22.

At a *voir dire* hearing before the Trial Court, Waller testified that, upon returning to his cell at the Philadelphia Detention Center after the interview on September 21, he rethought the consent which he had given and decided that he wished to withdraw the consent to a search for the watch. This, he testified, he was unable to do because he could not contact the Delaware Police. Both defendants now argue that the Delaware Police, upon returning to the Philadelphia Detention Center the following day, should have contacted Waller to determine if he still consented to the search; that because they did not do so, and because Waller by that time wished to withdraw his consent, the defendants assert that the search for the watch was unlawful.

The issue for decision is whether the authority to search manifested by Waller's signing of the consent form "lapsed" before the State Police conducted the search [10] the following day, so that a reaffirmation of consent was necessary.

A brief "lapse of time between the consent and the search does not require a reaffirmation of the consent as a condition precedent to a lawful search." *State v. Koucoules*, Me.Supr., 343 A.2d 860, 872 (1974). On the other hand, a consent to search does not mean the constitutional protection against unreasonable searches and seizures has been waived for all time and for all things. See *People v. Chism*, Mich. App., 32 Mich.App. 610, 189 N.W.2d 435, 445 (1971), aff'd., Mich.Supr., 390 Mich. 104, 211 N.W.2d 193 (1973).

We note that there is authority holding that a validly obtained consent to search, once obtained, may not be revoked. *People v. Kennard*, Colo.Supr., 175 Colo. 479, 488 P.2d 563 (1971); *Smith v. Commonwealth*, Ky.App., 197 Ky. 192, 246 S.W. 449 (1923); *Consent Searches: A Reappraisal After Miranda v. Arizona*, 67 Col.L.Rev. 130, 157 n. 121 (1967).

In our view, however, the best answer to the question "how long does a consent to search last" depends upon the facts and circumstances of each case. See 68 *Am.Jur.2d* 699. The length of time a consent lasts depends upon the reasonableness of the lapse of time between the consent and the search in relation to the scope and breadth of the consent given. If the consent to search is voluntarily and knowingly given, compare *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed. 854 (1973), and if the search takes place within a reasonable time of the consent and is limited to the scope and breadth thereof, a mere change of mind will not render the search violative of a defendant's Fourth Amendment rights. Compare *State v. Koucoules*, 343 A.2d at 872; *People v. Chism*, 211 N.W.2d at 204.

---

10. In this context, the term "search" is somewhat misleading. The Delaware State Police did not conduct a wholesale search of Waller's belongings. Rather, they walked up to a "window" at the Philadelphia Detention Center, presented the consent form, and someone behind the window brought down Waller's belongings and handed them the watch. The narrow scope of this "search" is especially significant.

■ In the instant case, the consent given by Waller to the Delaware State Police was written and signed, and it authorized a search specifically for the Timex watch in question. The record is clear that Waller knew he was signing a consent to search and that he voluntarily agreed to do it. It is also clear that the police did not go beyond the limited scope of the consent in conducting the search: only one search was conducted and only the watch was sought and obtained.

Waller signed the consent form at approximately 4:00 p. m. on September 21. The Delaware police officers reported to the Philadelphia Detention Center at 10:00 a. m., the following day and had to wait almost two hours before the Center personnel presented the watch. Thus, there was an interim of about 20 hours. The reason that the watch was not sought immediately upon obtaining consent the previous afternoon, according to police testimony, was that the Delaware police knew that the watch was safe in the hands of the Philadelphia authorities and there remained further investigation to accomplish on the previous afternoon.

We also note that, according to the record, Waller was able to observe the watch being turned over to the Delaware State Police. At that time he made no attempt to speak or in any way to indicate that he wished the search to cease. While he claims he had no way to contact the Delaware police, the record fails to reveal any attempt by Waller to advise the authorities at the Philadelphia Detention Center of his desire to withdraw his consent in the hope that his message would be transmitted to the Delaware police.

In view of the apparent good faith on the part of the State police, the limited nature of the search made strictly in accordance with the scope of the consent given, and the reasonableness of the 20-hour delay between consent and search, we conclude that the consent of defendant Waller was in effect when the Timex watch was obtained by the police. Compare *Steigler v. State*, Del.Supr., 277 A.2d 662 (1971).[11]

Accordingly, under the facts and circumstances in this case, the Trial Court did not err in admitting Horstman's watch into evidence.

## IX.

The defendants contend that, since both Pryor and Anderson testified under oath in court as to the same events, the Trial Court abused its discretion by admitting into evidence the prior out-of-court statements of Pryor and Anderson concerning the events of August 6.

■ The out-of-court statements of Anderson and Pryor were admitted pursuant to 11 *Del.C.* § 3507, which provides in pertinent part:

"§ 3507. Use of prior statements as affirmative evidence.

"(a) In a criminal prosecution, the voluntary out-of-court prior statement of a witness who is present and subject to cross-examination may be used as affirmative evidence with substantive independent testimonial value.

"(b) The rule in subsection (a) of this section shall apply regardless of whether the witness's in-court testimony is consistent with the prior statement or not. The rule shall likewise apply with or without a showing of surprise by the introducing party. * * *."

Under § 3507, prior out-of-court statements may be admitted provided that the declarant testifies upon direct examination at trial, *Keys v. State*, Del.Supr., 337 A.2d 18 (1975), and the offering party demonstrates that the statement was voluntarily made, *Hatcher v. State*, Del.Supr., 337 A.2d 30 (1975).

■ In the instant case, the statements of Pryor and Anderson were introduced by the State subsequent to their taking the stand for direct examination. Furthermore, the voluntariness of the statements

---

11. In *Steigler*, this Court upheld a continuing police search during a period of 15 hours after defendant had offered his apparent consent. 277 A.2d at 666–67.

was proven. The defendants suggest that the Trial Court erred in allowing police officers to testify to the voluntariness of the out-of-court statements, because, by so doing, the police officers were impermissibly "vouching" for the credibility of Pryor and Anderson. The record reveals no sound basis for this contention. On the contrary, it appears that the testimony of the police officers was elicited for the purpose of showing that the statements of Anderson and Pryor were voluntary, without duress or coercion, *State v. Rooks*, Del.Supr., 401 A.2d 943, 947 (1979). No testimony was offered in rebuttal by the defendants on the issue of voluntariness.

We conclude, therefore, that the Trial Court committed no error in admitting the out-of-court statements of Pryor and Anderson.

## X.

Count 3 (amended) of the indictment under which defendants were convicted charges that Gray and Waller

"...on the 6th day of August, 1977, in the County of Sussex, State of Delaware, did commit Murder in the First Degree, to wit, did, with criminal negligence, cause the death of John Melvin Horstman in the course of, and in the furtherance of, committing the crime of Kidnapping and Robbery in the First Degree as described in the first two counts of the original Indictment."

The defendants assert that the Trial Court erred as a matter of law in entering a judgment upon the jury verdict of guilty of Murder in the First Degree because the State failed to prove, as set forth in Count 3 (amended) of the indictment: (1) that Horstman died on August 6, 1977; and (2) the cause of death.

■ As to the time of death: We think that the indictment was not defective. Read fairly, the indictment charges that the defendants caused the death of Horstman through their actions on August 6, 1977; it does not state that Horstman necessarily died on that date. Consequently, the State did not have to prove that Horstman died on August 6, 1977.

Moreover, a defective date in the indictment would not constitute ground for reversal of the convictions. In *Pepe v. State*, Del.Supr., 3 Storey 417, 171 A.2d 216, 218 (1961), this Court stated:

"Indictments and informations in Delaware now are sufficient in law if drawn with such particularity that the accused will be fully informed of the charge he will be required to meet, and, upon the basis of such information, will be given a reasonable opportunity to prepare his defense, and to permit the pleading in future prosecutions of the proceeding as a bar to further prosecution upon the same facts."

The indictment before us met the *Pepe* tests of sufficiency and particularity as to the time of death.

■ As to the cause of death: The defendants point out, correctly, that the State Medical Examiner who attended the scene and pronounced the victim dead, was unable to state with medical certainty the exact cause of Horstman's death. However, this fact in itself is hardly determinative of the issue before us.

The Criminal Code provides: "Conduct is the cause of a result when it is an antecedent but for which the result in question would not have occurred." 11 *Del.C.* § 261. It has been written that "every one is held bound to contemplate and to be responsible for the natural consequences of his own voluntary act; * * * it does not alter the nature of the felonious act, nor diminish its criminality to prove that other causes contributed to the fatal result * * *." *State v. Johnson*, Del.O. & T., 6 W.W.Harr. 341, 175 A. 669, 670 (1934). Compare *Quillen v. State*, Del.Supr., 10 Terry 114, 110 A.2d 445 (1955). In the instant case, the State contends that it has fully met this burden of proving "but for" causation. We agree.

The record is replete with testimony concerning the defendants' roles in the incident. Pryor, Anderson and Gray testified at trial; in addition, their prior statements were admitted into evidence, as was that of

Waller. All those statements tended to incriminate these defendants. The evidence clearly demonstrates that the defendants abducted and robbed Horstman; struck him, tied him to a tree—binding his head, hands, arms and feet, and placing a gag in his mouth—and then left him, alone, in a desolate wooded spot. Just as clearly, the evidence demonstrates that Horstman died in that wooded area.

The Medical Examiner testified: that the human body, when it decays, goes through a process of "putrefaction," in which the body literally melts into the ground; that the dirt at the base of the tree where Horstman was tied was dark and greasy, a condition characteristic of the process of putrefaction; that, in her opinion, Horstman died while tied to that tree.

Considering this evidence as a whole, we conclude that the State met its burden of proving causation, and that the jury was warranted in finding that the actions of the defendants caused the death of Horstman.

## XI.

Defendant Gray contends that the Trial Court erred in refusing to allow him to introduce testimony concerning his alleged affliction with chronic alcoholism. Gray contends that this evidence was relevant for two purposes: (1) to negate the state-of-mind element of the underlying offenses of Kidnapping and Robbery; and (2) to prove that his alcoholism, in conjunction with his limited mental capacity, established a "mental illness" defense.

**12.** Gray apparently relied upon 11 *Del.C.* § 423 which provides:

"§ 423. Involuntary intoxication as a defense.

"In any prosecution for an offense it is a defense that, as a result of intoxication which is not voluntary, the actor at the time of his conduct lacked substantial capacity to appreciate the wrongfulness of his conduct or to perform a material element of the offense, or lacked sufficient willpower to choose whether he would do the act or refrain from doing it."

**13.** This *combination* alcoholism-low intellect argument is a novel approach, probably pursued because 11 *Del.C.* § 422 provides that "Intoxication does not, *in itself*, constitute men-

## A.

Gray wished to introduce testimony of his alcoholism to negate the intent element of the underlying offenses of Kidnapping and Robbery.[12] In his offer of proof, counsel for Gray stated that he intended to produce several witnesses who would testify as to Gray's excessive drinking. The State objected to the admission of the testimony on the grounds of irrelevancy. The Trial Court sustained the objection. We agree with that ruling.

Specifically, none of the witnesses proffered in Gray's offer of proof were present when Horstman was abducted, robbed, tied to the tree and left to die. Consequently, the proffered testimony could have no bearing on what Gray said, did, thought, "appreciated" or intended at that particular time. The proffered testimony was irrelevant, and therefore properly excluded. Cf. *Young v. Soroukos*, Del.Supr., 6 Storey 44, 189 A.2d 437 (1963).

## B.

Gray also sought to establish that his alleged alcoholism, in conjunction with his low intellect, combined to form a "mental illness" defense.[13] During the offer of proof, counsel for Gray proffered the testimony of the State Psychologist who had examined Gray and who, it was said, would testify "concerning alcoholism, that consumption of alcohol by an alcoholic is an involuntary matter, that this is something he cannot control once he starts, and that,

tal illness or mental defect within the meaning of § 401 of this title." (Emphasis added)

Delaware's Mental Illness Statute, 11 *Del.C.* § 401, provides:

"(a) In any prosecution for an offense, it is an affirmative defense that, at the time of the conduct charged, as a result of mental illness or mental defect, the accused lacked substantial capacity to appreciate the wrongfulness of his conduct or lacked sufficient willpower to choose whether he would do the act or refrain from doing it.

"(b) If the defendant prevails in establishing the affirmative defense provided in subsection (a) of this section, the trier of facts shall return a verdict of 'not guilty by reason of insanity.'"

combined with Mr. Gray's low intellectual ability, could have placed him in a position mentally of being unable to appreciate the wrongfulness of his conduct or to substantially control his conduct on the date in question, August 6th."

We find the defendant's contention in this regard to be untenable. Compare *Powell v. Texas*, 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968). The contention amounts to a defense of diminished responsibility. In *Bates v. State*, Del.Supr., 386 A.2d 1139 (1978), we declined to recognize the defense of diminished responsibility. We there held that "until established by the General Assembly as a provision collateral to the Statutes governing insanity and extreme emotional distress, the doctrine of diminished responsibility may not be invoked in this State." 386 A.2d at 1143–44. Stripped to the essentials, the attempted combination of alcohol and low intellect to constitute an effective defense is more closely akin to diminished responsibility than it is to mental illness. Accordingly, the Trial Court correctly barred the proffered evidence of chronic alcoholism as a defense.

## XII.

Pursuant to an objection made by the State during defense counsel's opening statement, the Trial Court gave the following limiting instruction to Gray's defense counsel as to his opening remarks:

"The Court's instruction is for you to discuss the law only as it applies to the facts. The Court will discuss the law at the conclusion of the case as you well know, and the Court is instructing you not to discuss the law at length without applying it to specific facts. * * * I only want you to state the law as it applies to the facts which you intend to set forth or the facts which the state intends to set forth."

Gray asserts that the Trial Court improperly limited defense counsel's opening statement, prejudicing his right to a fair trial and impeding his ability to point out the weaknesses in the State's case.

This issue is controlled by this Court's decision in *Holmes v. State*, Del.Supr., 422 A.2d 338 (1980). There we upheld a Trial Court instruction limiting defense counsel's opening statement "to what you intend to prove in the case," stating:

"As to abuse of discretion, it appears that the Trial Judge was acting to prevent defense counsel from making comments as to the law. We believe this limitation was not an abuse of discretion.

" 'The proper function of the opening for accused is to enable him to inform the court and jury what he expects to prove. It is not and should not be permitted to become an argument on the case, or an instruction as to the law of the case....' "

422 A.2d at 340, quoting 23A C.J.S. Criminal Law § 1086 at 109 (1961).

The record indicates that, after a lengthy discussion in the absence of the jury, counsel for defendant Gray was permitted to state portions of the law "succinctly." In view thereof, the limitation on counsel, here complained of, was minimal.

Accordingly, we hold that the Trial Court did not abuse its discretion in limiting defense counsel's opening statement.

## XIII.

Defendant Waller contends that the Trial Court abused its discretion by assigning the two defendants 20 peremptory challenges collectively, rather than specifically giving each defendant 10 each.

Superior Court Criminal Rule 24(b) [14] grants to the Trial Court, in multiple-defendant cases, the discretion whether

---

14. Rule 24(b) provides, in pertinent part:

"(b) Peremptory Challenges. In capital cases the State shall be entitled to 12 peremptory challenges and the defendant or defendants shall be entitled to a total of 20 peremptory challenges.

"* * *

"If there is more than one defendant, the Court may allow the defendants additional peremptory challenges and permit them to be exercised separately or jointly."

to allow additional peremptory challenges and whether to allot them separately or collectively. Given the fact that Waller can point to no prejudice caused by the Trial Court's ruling in the instant case, we find no abuse of discretion in the Trial Court's granting 20 challenges jointly. See generally *Foraker v. State*, Del.Supr., 394 A.2d 208 (1978); *Shields v. State*, Del.Supr., 374 A.2d 816, cert. den. 434 U.S. 893, 98 S.Ct. 271, 54 L.Ed.2d 180 (1977).

### XIV.

 Finally, the defendant Waller contends that he was denied a fair trial by the prejudicial conduct of the State in bringing into the courtroom the clothes of the victim, which emitted an obnoxious odor, and commenting upon them in front of the jury. The clothes were not in evidence at the time.

In response, the State contends that there is no evidence in the record to reflect any such event, and the prosecutor denies any recollection of it. However, an examination of the record shows that while the State prosecutor was questioning a police officer about the victim's trousers (which were not offered into evidence at the time), the prosecutor stated "You may remove those from the courtroom," obviously referring to some item present in the courtroom.

The following morning, immediately upon the resumption of trial, Waller's defense counsel moved for a mistrial, claiming that the event was highly inflammatory and prejudicial to his client. The Trial Judge seemed to know nothing of the incident, but questioned the attorneys as to what occurred. Finally, the Court denied the motion.

Such conduct on the part of the prosecutor, if it occurred, would be subject to severe criticism. However, we are unable to hold, upon the record before us, that the Trial Court abused its discretion in denying

the motion for mistrial. Accordingly, the ruling is upheld.

\* \* \*

The convictions of James W. Waller and George W. Gray stand

AFFIRMED.