802 A.2d 1130

**Richard Brandon GREEN**

v.

**STATE of Maryland.**

No. 00683, Sept. Term, 2001.

Court of Special Appeals of Maryland.

July 8, 2002.

Claudia A. Cortese, Assistant Public Defender (Stephen E. Harris, Public Defender on the brief), Baltimore, for appellant.

Leigh S. Halstad, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, Baltimore, and David W. Gregory, State's Attorney for Queen Anne's County of Centreville, on the brief), for appellee.

Submitted before HOLLANDER, EYLER, JAMES R. and SONNER, JJ.

HOLLANDER, J.

Richard Brandon Green, appellant, was stopped for speeding in Queen Anne's County. In a search of Green's car at the scene, police found marijuana and cocaine. As a result, appellant was charged with narcotics violations. Green moved to suppress the fruits of the warrantless search but, after an evidentiary hearing, the court denied the motion, finding that the search was consensual. On March 15, 2001, Green tendered a plea of not guilty in the Circuit Court for Queen Anne's County, and proceeded by way of an agreed statement of facts. Thereafter, he was convicted of possession of marijuana with intent to distribute and possession of cocaine, for which the court sentenced him to consecutive terms of four years and two years, respectively.

On appeal, appellant poses a single question: "Did the trial court err in denying [his] motion to suppress the cocaine and marijuana found in his car?" That question requires us to focus on whether the lawful traffic stop ripened into an illegal detention or, instead, a consensual encounter in which appellant voluntarily consented to the vehicle search.

## SUPPRESSION HEARING FACTS

The court held a suppression hearing on September 28, 2000. The following evidence was adduced at the hearing.

Deputy Mark Meil of the Queen Anne's County Sheriff's Office testified that, on the evening of March 26, 2000, he was working stationary radar near Route 302 and Dixon Tavern Road in Queen Anne's County. At around 7:30 p.m., he clocked a black 1999 Mercury traveling westbound on Route 302 at 65 m.p.h.; the zone had a posted speed limit of 50 m.p.h. Accordingly, the deputy activated his emergency equipment and executed a stop of the car. Upon exiting his vehicle, the deputy approached the driver's side of the Mercury. Appellant, who was sitting in the driver's seat, was the sole occupant of that vehicle. The deputy told appellant that he had stopped him for speeding. In response to the deputy's request, appellant produced his license and vehicle registration. Appellant also responded to an inquiry from the deputy by stating that he had two points on his license.

The deputy returned to his cruiser and ran a check of appellant's license and registration, and "a criminal check for any caution codes for officers' safety." Shortly thereafter, the deputy learned that appellant's license was valid, the vehicle was registered to Green, appellant had several points on his license, and there were no outstanding warrants for Green's arrest. The deputy testified that he decided to issue a warning citation to appellant, which he wrote while in the cruiser.

As the deputy walked towards appellant's car, he was advised, via police radio, that appellant had "prior caution codes for armed and dangerous and ... drugs." Nevertheless, Meil advised Green that he was issuing a warning citation

to him for speeding. Moreover, Meil said that he returned appellant's license and registration at that time, and also gave him the warning. Additionally, Meil asserted that he "advised [appellant] that he was free to go...." In view of Green's "past history," however, Meil immediately asked appellant whether he would "mind answering a few questions before he [left] the scene...." According to the deputy, appellant responded, " 'Sure.' " Appellant does not dispute that he said "sure" in response to the deputy's request.

While appellant was seated behind the steering wheel, with the keys in the ignition, the deputy asked appellant whether he had any guns, drugs, or alcohol in the car. Appellant responded, "No." Meil testified that he then made another request of appellant; he asked Green "if he would consent to a search of his person and vehicle...." According to Meil, appellant replied, 'Sure. Go ahead.' " Appellant disputes that comment.

After Green consented to the searches of person and vehicle, the deputy asked appellant to exit the vehicle "for officer safety given [appellant's] past criminal history of armed and dangerous, not knowing whether there might be a hand gun in the vehicle." Moreover, after appellant gave his consent, the officer called for back-up, for the purpose of "watch[ing] the Defendant while [Meil] searched the vehicle." The deputy explained that he made the request for back-up for "officer safety," because he could not watch Green while also searching the car. When asked what the officer was "worried" about, Meil answered: "Given the area and location, it was extremely dark out, [appellant] was much larger than I was, his past criminal history of violence with hand guns, I didn't feel good about that at all." The deputy did not tell appellant that, if he consented to a search, he would have to wait for the arrival of a back-up unit.

When appellant exited his car, Deputy Meil frisked appellant and searched his pockets, but found nothing noteworthy. The deputy then "visually" looked in the "open areas" of the car at that time, but did not observe anything significant.

Deputy Meil did not conduct a full scale search of the car at that time. Instead, he and appellant waited about fifteen minutes for the arrival of the back-up unit; only then did Meil conduct a thorough vehicle search.

According to Meil, appellant "was free to go at any time." Meil acknowledged, however, that although he told appellant he was free to go at the time he returned appellant's documents, he never informed appellant that he could refuse to consent to the frisk or the vehicle search. Moreover, Meil never informed appellant that he could leave if he did not want to continue to wait for the arrival of the back-up unit. Deputy Meil maintained, however, that appellant never said that he wanted to leave, nor did appellant indicate that he changed his mind about allowing Deputy Meil to search his car.

Meil acknowledged that appellant "was cooperative the whole time," stating: "I never had a problem with him." Moreover, Meil conceded that appellant never tried to escape during the encounter, he never threatened Meil in any way during the stop, and he never made any "furtive movements" suggestive of an effort to hide contraband or retrieve a weapon. In short, the deputy did not identify anything about appellant's conduct or behavior that amounted to reasonable, articulable suspicion to continue the detention. While Meil and Green waited for back-up, Meil learned from appellant that appellant had been convicted of armed robbery about fifteen years earlier.

Corporal Riggleman testified that, at about 7:45 p.m. on March 26, 2000, he was advised to respond to the scene. He recalled that it took him about 15 to 20 minutes to reach the location. When asked if he was at the scene "to make sure [that] appellant didn't leave," Riggleman answered, "Correct."

Upon the arrival of Corporal Riggleman, Deputy Meil searched appellant's car while the corporal watched appellant. The search began at about 8:04 p.m. During the search, the deputy's attention was drawn to the center console by the faint odor of marijuana. The deputy opened the console and found a black zipper bag containing two bags of a green leafy

substance. The zipper bag also contained 110 bags of various colors and sizes; they contained a white rock like substance of suspected cocaine. Appellant was then arrested.

Appellant also testified at the hearing. Much of his testimony was consistent with the State's evidence or was never disputed by the State.

On the night in question, appellant was driving on Route 302 in his 1999 Mercury Sable when he was stopped for speeding by Meil. He produced his license and registration, which Meil took back to his cruiser. Appellant claimed that the deputy did not give him his license or registration when the deputy returned to appellant's car. But, appellant agreed that Deputy Meil asked him if he would answer a few questions, and appellant said, "Sure." Deputy Meil then asked whether appellant had any guns, drugs, or alcohol in his car, and appellant replied that he did not. The deputy also inquired about appellant's criminal record, and then asked Green to submit to the search of his car. Appellant claimed that he refused to consent to a search. At that point, according to Green, Deputy Meil told him, "You have to step out of the vehicle, sir," and appellant complied. In his testimony, Green explained that he complied because he did not believe that he had a choice. Appellant acknowledged, however, that after he was ordered out of his car, he never told Meil that he wanted to leave.

Meil proceeded to frisk appellant. The deputy also emptied appellant's pockets. Then, using a flashlight, the officer looked inside Green's vehicle, while appellant was required to stand with his hands on the trunk of the car. As the officer peered into the car, appellant asked the deputy if he wanted appellant to open the trunk. Appellant testified:

[The deputy] had me stand with my hands on the trunk of my car and he went in my car. He took his flashlight. He looked under the passenger, the driver's side of the seat first. Then he got out, closed that door and went around to the passenger's side and looked under that seat. So, at that point, I said, "Well, do you want me to open the trunk for

you?" He said, "No. You just stand right there like that." I said, "Okay." So, at that point, he said, "Well, I'm going to call for back up." I said, "Why I got to go through all of this for for just a traffic stop?" He said, "Because of your criminal record."

According to appellant, upon Corporal Riggleman's arrival, Riggleman spoke with Meil and then put his hand on appellant's arm, while asking appellant to come back to the car with him. Appellant testified that neither officer ever advised him that he could refuse to consent to the search or that he was free to leave. After Meil searched the car, appellant was arrested. Appellant claimed that Deputy Meil did not return his license and registration to him until appellant "was on [his] way to the magistrate's office after all this paper work and stuff was done." Green reiterated that, while at the scene, he did not believe he was free to leave, nor did the officer tell him that he could go.

In argument, the prosecutor said: "Consent was given. It was never withdrawn. The search was valid." The prosecutor also said: "The question here is very simple: Was the encounter after the license, registration and ticket was given back to the Defendant consensual in nature[?]." Further, the State asserted: "So, the issue is, if Your Honor believes consent was given and that's totally a question of credibility, if you believe that consent was given, the second issue and those are the only two issues is: Was it ever withdrawn and the answer is, there are no facts to support that it was withdrawn...."

The prosecutor also sought to distinguish *Ferris v. State,* 355 Md. 356, 735 A.2d 491 (1999), arguing:

... *Ferris* talked about a number of factors. The first one, the two most important: Was he told he was free to leave? The officer tells you he told him he was free to leave. The second factor, the most important is: Removal of the Defendant from the vehicle. Here, consent was given while the Defendant's in the vehicle. He's got all his items back. The Defendant is in the driver's seat with the ability to take

off at the point when consent is asked. Very, very different from *Ferris*. There isn't any passengers, there's no separation from the passengers. He doesn't get him out of the car at all until after consent is given. At the time when consent is given there's only one officer. Again, he's told he's free to go and he clearly could have at that point. It's not the officer's problem and the cases are clear. The officer has no responsibility to tell him that he has a right to refuse. It's a factor to be considered whether a reasonable person would believe they are free to go but, he has no responsibility to do that.... Once the consent is given, then the question is, the only question is, was it ever withdrawn?

The prosecutor continued:

By [appellant's] own testimony ... he says ... do you want me to open the trunk. He never says, hey, I want to leave. He never says, give me back, even if you believe his testimony, give me back my license and registration. I want to go. I'm tired of waiting. There's none of that.... [I]t's not the Court's fault, the State's fault, Deputy Meil's fault that the Defendant didn't say, I want to go. Had he, Deputy Meil testified that had he said it, he would have let him go. The point is, and Your Honor is faced with this situation all the time, which is, why, why would this person have given, granted consent? ... You hear it all the time and the answer is it happens all the time. People, for whatever reason, think that the officer is bluffing. Who know[s]? The point is, it happens all the time.

The defense attorney countered that appellant never consented to the search. He said:

[O]nce ... the initial reason for the traffic stop is satisfied ... the officer is actually under a duty to let, to expedicially [sic] issue the citation and allow the defendant to leave the scene. Now, the State's version is, well we had consent. And so, I believe that consent is a major part of this issue because what happens is is that Mr. Green is asked out of the vehicle. He's searched and all under the pretext that Mr. Green has given his consent to 1. be asked questions

and 2. to have his vehicle searched, all of which he denies and I think that if you believe his testimony or not, I think that ends it.

Alternatively, the defense lawyer argued that, even if the court did not credit Green's testimony, the search was still illegal. He stated, in part:

If you don't believe. Mr. Green's denial of . . . the consent to [search] the vehicle, I believe that still another seizure of Mr. Green occurs. Regardless of whether or not you believe this initial consent occurs and this is what I, kind of the main part of the thrust of my argument is this. Once the officer has Mr. Green get out of the vehicle, pats him down, does the search, looks in the vehicle which he admitted, which he testified that he did. He looked in the vehicle, looked under the seats and then came back. Once he tells [M]r. Green, I'm going to call for back up . . . I believe that's when the second seizure occurs and therefore, Mr. Green is not free to leave. And what you need to look at are the totality of the circumstances concerning that. . . .

After outlining the similarities between the underlying case and *Ferris,* the defense attorney continued:

The problem that occurs is when they have to wait the fifteen to twenty minutes for Corporal Riggleman to arrive. And in fact, it was a long period to wait because even Deputy Meil testified that he had to call and check on the status of the back up unit that was supposed to come . . . to the scene. . . . I believe that the search occurred when the deputy looked in the vehicle. . . . I believe that another seizure then occurs when he says, no, you have to stay here. We're going to wait for my back up unit. And Your Honor, I think you can . . . infer . . . that a reasonable person is not going to feel that they are able to leave the scene when an officer has made them get out of the car, patted them down, searched the contents of their vehicle, told them that they are calling for a back up unit. . . . I don't believe that a reasonable person could infer that whether or not you believe Mr. Green was given the citation and the license . . .

I don't think that the Court can make a finding that a reasonable person felt that they could get back in that vehicle, stop the search and leave the scene. They are waiting for another officer.... Corporal Riggleman said, "My job was to make sure that ....," and you heard that testimony and that's unrebutted. Corporal Riggleman was there to make sure Mr. Green didn't leave.

\* \* \*

[E]ven if you believe that the consent was given, my argument is this, is that he was seized again once the officer makes him stay and wait for the trooper to arrive on the scene. There's a seizure. He's not free to go. There was no ... reasonable articulable suspicion to believe that any type of criminal activity was afoot at that time and therefore, the seizure was unreasonable and therefore the search is invalid and I'm going to ask you to suppress the search....

Thereafter, the court orally denied the suppression motion. We quote almost the entire opinion, not only for what it says, but also for what it omits:

The interesting question in this case as in so many other[s] is one involving which version one is going to believe because until one has the facts, it's very difficult to try to figure out the law that's going to apply especially in this very slippery area. Things are pretty close together up to a point but then the officer says that he returned the license and registration together with the warning and told the Defendant that the could leave. [T]hen [the deputy] asked if he could ask [appellant] if he could ask him some questions and the Defendant indicated that he could, these questions that were prompted by what was said to the officer over his official police channel and that being that the Defendant was dangerous and that he had some connection with controlled dangerous substances. Now, the Defendant categorically denies this and has a story which almost at every turn establishes a scenario in which the search would have been illegal.... The situation where drugs or any

contraband is found after a consent search to the rational person is wholly irrational and almost impels one on the basis of logic to conclude that there could not have possibly been a consent search. That is to say, if a person obviously knew that the things were there, why would they give them consent. Anyone who has had any contact with the criminal law knows that that's one of the great unanswered questions.... But, I do know that this kind of consent is given. I also know that one has to deal with it very, very carefully because there's still the situation that there was not real consent or that the consent was in some way coerced either not directly or circumstantially. In this case, the one telling feature as I started to say is that as the Defendant is running through his narrative rather glibely [sic], he candidly indicates that he ... invited ... unasked, the police to search the trunk of the car. Now, if he were in a hostile situation, and he had not consented in the first place, if he was, as he said, mildly irate but mildly concerned because he couldn't understand why the search was taking place after he had said, as he says, for a minor traffic stop, why in heaven's name would he have done that? The only real answer to that is that he did not because he had agreed to the search in the first place. That conclusion is reinforced in my mind when I see the Defendant who, as the officer pointed out in his testimony, is physically very prepossessing and was significantly larger in both height and build than the, the police officer. Moreover, he is not, as his testimony indicated, a bashful type.... [I]t's impossible for me to believe that the situation could have occurred as [Green says] it did and at the same time he offered to use the trunk. So therefore, I'm compelled to conclude and I find as a fact that consent was actually given. That being the case, the State's Attorney is correct that if there was some reason for the Defendant, that consent was given, it was never withdrawn. And again, one little shard of information, it came right from the Defendant, at the end or near the end of this entire (inaudible) when logically, the way he was telling it, the police were almost finished or

finished, he suggests prolonging it, if nothing else, by inviting them to search the trunk. He, I think, was quite aware that he could leave. He didn't seem to be terribly threatened by the situation and he seemed to be very interested in assisting the police in what they were doing. Posturing it may have been but it nevertheless occurred and he admits it occurred. So therefore, I do not think that there was any illegal search in this case and the motion is denied.

## DISCUSSION

### I.

Appellant contends that the court erred in denying his motion to suppress the drugs found in his car. His argument is essentially twofold. First, citing *Ferris*, 355 Md. 356, 735 A.2d 491, and *Charity v. State*, 132 Md.App. 598, 753 A.2d 556, *cert. denied*, 360 Md. 487, 759 A.2d 231 (2000), appellant contends that the search was invalid because it occurred during an unlawful, non-consensual second seizure, in violation of the Fourth Amendment, and therefore any consent was involuntary. In his view, "his purported 'consent' as found by the [suppression court] was not made freely under the circumstances." Second, appellant argues that, even if his initial consent to search was valid, it was rendered invalid because of the delay in effecting the search; he characterizes the delay as "undue," and maintains that the search exceeded the scope of any consent. In support of his temporal contention, appellant refers us to a 1982 Delaware case. *See Gray v. State*, 441 A.2d 209, 220 (Del.1982). Appellant also notes that "[t]he court never reached this issue in its opinion except to say that consent 'was never withdrawn.' "

The State responds that "Green['s] second encounter with the police was voluntary" because the traffic stop had ended and appellant was not "seized" when the deputy asked him to consent to the search. In the State's view, "Green's consent to search was valid because: (1) it was given during a consensual encounter and (2) Green did not withdraw that consent."

Although the State concedes that it had the burden to prove, by a preponderance of the evidence, that appellant voluntarily consented to the search, it contends that it was not obligated to show that appellant had actual knowledge of the right to withhold consent to search.

The State shoulders the ultimate burden of proving that evidence seized without a warrant should not be suppressed. *See State v. Bell,* 334 Md. 178, 191, 638 A.2d 107 (1994). Our review of the trial court's ruling with respect to a suppression motion "ordinarily is limited to information contained in the record of the suppression hearing." *Cartnail v. State,* 359 Md. 272, 282, 753 A.2d 519 (2000); *see Ferris,* 355 Md. at 368, 735 A.2d 491; *State v. Fernon,* 133 Md.App. 41, 43, 754 A.2d 463 (2000). We review the evidence in the light most favorable to the prevailing party. *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239 (1990); *Charity,* 132 Md.App. at 606, 753 A.2d 556 ("Our ruling will be based exclusively on the [prevailing party's] most favorable version of the events."). Moreover, "[w]hen conflicting evidence is presented, we accept the facts as found by the hearing judge unless it is shown that those findings were clearly erroneous." *Charity,* 132 Md.App. at 606, 753 A.2d 556; *see Ferris,* 355 Md. at 368, 735 A.2d 491; *Fernon,* 133 Md.App. at 44, 754 A.2d 463. In our review, we also give due regard to the motion judge's opportunity to assess the credibility of the witnesses. *McMillian v. State,* 325 Md. 272, 281–82, 600 A.2d 430 (1992); *Fernon,* 133 Md. App. at 43, 754 A.2d 463.

Nonetheless, we must make our own independent constitutional appraisal as to second level findings, such as whether a search was lawful or a defendant voluntarily consented to a police entry. *Ornelas v. United States,* 517 U.S. 690, 697, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *Cartnail,* 359 Md. at 282–83, 753 A.2d 519; *Turner v. State,* 133 Md.App. 192, 203, 754 A.2d 1074 (2000); *Fernon,* 133 Md.App. at 44, 754 A.2d 463; *Charity,* 132 Md.App. at 607–09, 753 A.2d 556. We accomplish this by reviewing the law and applying it to the first-level facts found by the suppression judge. *In re Tariq*

*A–R–Y*, 347 Md. 484, 488–89, 701 A.2d 691 (1997), *cert. denied*, 522 U.S. 1140, 118 S.Ct. 1105, 140 L.Ed.2d 158 (1998); *Riddick*, 319 Md. at 183, 571 A.2d 1239; *Howard v. State*, 112 Md.App. 148, 156, 684 A.2d 491 (1996), *cert. denied*, 344 Md. 718, 690 A.2d 524 (1997). Similarly, we must independently assess whether the proper scope of a traffic stop was exceeded, so as to require an independent justification "for the roadside proceedings that followed." *Charity*, 132 Md.App. at 608, 753 A.2d 556. As Judge Moylan noted for the Court in *Charity*, whether there was one stop or two is a "conclusory or constitutional fact with respect to which the reviewing court must make its own independent, *de novo* determination." *Id.* at 609, 753 A.2d 556; *see Whitehead v. State*, 116 Md.App. 497, 505–06, 698 A.2d 1115, *cert. denied*, 348 Md. 207, 703 A.2d 148 (1997); *Munafo v. State*, 105 Md.App. 662, 672, 660 A.2d 1068 (1995).

Appellant complains, *inter alia*, that the court below did not consider the factors identified in *Ferris*, 355 Md. 356, 735 A.2d 491, as to consent. He argues that the circuit court's "failure to do more than find that Appellant 'consented' to the search requires that its decision to deny Appellant's motion to suppress be reversed." Because this Court must make its own independent, constitutional appraisal by reviewing the law and applying it to the facts of the case, *Jones v. State*, 343 Md. 448, 457, 682 A.2d 248 (1996), we agree with the State that the failure of the suppression court to discuss the factors identified in *Ferris* does not necessarily compel a reversal.

## II.

The Fourth Amendment protects against unreasonable searches and seizures. *United States v. Mendenhall*, 446 U.S. 544, 551, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). A traffic stop involving a motorist is a detention that implicates the Fourth Amendment. *See United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); *Rowe v. State*, 363 Md. 424, 432, 769 A.2d 879 (2001); *Ferris*, 355 Md. at 369, 735 A.2d 491; *Edwards v. State*, 143 Md.App. 155, 164, 792 A.2d 1197 (2002). If the police have probable cause or reason-

able suspicion that a driver has committed a traffic violation, ordinarily a stop of the driver does not violate the Constitution. *See Whren v. United States,* 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). But, the detention of a person during a traffic stop "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion); *see Ferris,* 355 Md. at 369, 735 A.2d 491.

As we noted, appellant argues that he was subjected to a prolonged, illegal second detention. In contrast, the State claims that the traffic stop came to an end and a second encounter began, consensual in character. During the second encounter, according to the State, appellant was not seized and he voluntarily consented to the search.

A seizure can occur by means of physical force or by a "show of authority," coupled with submission to that authority. *California v. Hodari D.,* 499 U.S. 621, 628, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991); *Ferris,* 355 Md. at 375, 735 A.2d 491. The "show of authority" test is an objective one, measured by whether the officer's words and actions would have conveyed to a reasonable person that his or her freedom of movement was being restricted. *Hodari D.,* 499 U.S. at 628, 111 S.Ct. 1547. The "reasonable person test ... is objective and 'presupposes an *innocent* person.'" *United States v. Drayton,* —— U.S. ——, ——, 122 S.Ct. 2105, 2111, 153 L.Ed.2d 242 (2002) (citation omitted).

The test to determine whether a particular encounter constituted a seizure or, instead, a consensual occurrence, generally turns on whether a reasonable person would have felt free to "decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick,* 501 U.S. 429, 436, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); *see INS v. Delgado,* 466 U.S. 210, 215, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984); *Mendenhall,* 446 U.S. at 554, 100 S.Ct. 1870; *Ferris,* 355 Md. at 375, 735 A.2d 491. In *Florida v. Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991), the Supreme Court

said: "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *See Turner,* 133 Md.App. at 214–15, 754 A.2d 1074 (finding no implied consent where police did not request permission to enter but simply walked through open door).

 To determine whether a reasonable person would have felt free to terminate an encounter in a particular situation, "a court must apply the totality-of-the-circumstances approach, with no single factor dictating whether a seizure has occurred." *Ferris,* 355 Md. at 376, 735 A.2d 491; *see Drayton,* —— U.S. at ——, 122 S.Ct. 2105, 2111, ("The proper inquiry necessitates a consideration of 'all the circumstances sur-rounding the encounter.'") (citation omitted); *Bostick,* 501 U.S. at 437, 111 S.Ct. 2382; *Mendenhall,* 446 U.S. at 554, 100 S.Ct. 1870. However, there is no "litmus-paper test for distinguishing a consensual encounter from a seizure...." *Royer,* 460 U.S. at 506, 103 S.Ct. 1319. Indeed, the test is "necessarily imprecise," because it considers police conduct as a whole, in light of the particular "setting in which the conduct occurs." *Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988). Given the varied interactions between police officers and members of the public, resolution of each case is ultimately dependent on its underlying facts. *Bostick,* 501 U.S. at 436–37, 111 S.Ct. 2382; *Charity,* 132 Md.App. at 617, 753 A.2d 556.

## III.

This case is one of many involving a vehicle search that follows a lawful, routine traffic stop. Such cases often present "difficult analytical questions for courts...." *Commonwealth v. Strickler,* 563 Pa. 47, 757 A.2d 884, 890 (2000). In our analysis, we are guided by *Ferris,* 355 Md. at 356, 735 A.2d 491. Like *Ferris,* this case does not invoke a pretextual "*Whren*" stop. *See Whren,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89. Rather, as in *Ferris,* this matter originated with

a routine traffic stop for speeding. Unlike in *Ferris*, however, the State does not assert that the detention was prolonged based on a reasonable suspicion of wrongdoing that became evident during the traffic stop. Instead, the State maintains only that, at the relevant time, appellant was not seized and he voluntarily consented to the search of his car.

In *Ferris*, a trooper was operating a stationary radar gun at about 1:00 a.m. on Interstate 70 in Washington County, when he clocked the defendant's car traveling 92 m.p.h. in a 65 m.p.h. zone. The trooper activated his emergency equipment, stopped the car, exited the cruiser, and approached the defendant, who occupied the driver's seat; a passenger sat in the front passenger seat. The trooper asked the defendant, whose eyes were bloodshot, for his license and registration, which the defendant provided. Then, the trooper returned to his vehicle and verified that the defendant's papers were valid. As the trooper was writing a speeding ticket, he noticed that the driver and the passenger were moving around and frequently looking over their shoulders at him.

About this time, a second police car arrived. The trooper spoke to the second officer, who also noticed the two men moving around in their seats. The trooper then approached the driver's side door of the car while the second officer approached the passenger side. Although the trooper gave the defendant the citation and returned his license and registration, he did not advise the defendant that he was free to leave. Instead, he asked the defendant if "he would mind stepping to the back of his vehicle to answer a couple of questions." *Ferris*, 355 Md. at 363, 735 A.2d 491. The defendant "stated he didn't mind." *Id.* While the second officer watched the passenger, the trooper began asking the defendant questions about drug use. During the questioning, the defendant admitted that his passenger possessed a small amount of marijuana. The passenger handed the bag to the trooper. In a subsequent search of the car, a larger bag of marijuana was discovered.

The trial court denied the suppression motion, stating, *inter alia,* that the defendant answered the questions "without intimidation, voluntarily...." *Id.* at 366, 735 A.2d 491. On *certiorari* to the Court of Appeals, Ferris argued that what began as a lawful traffic stop developed into an illegal second stop once the purpose of the traffic stop was completed. The State countered, *inter alia,* that the stop was a "consensual encounter that did not implicate the Fourth Amendment" or, alternatively, that any seizure was justified. *Ferris,* 355 Md. at 368, 735 A.2d 491.

The Court concluded that "the traffic stop essentially came to an end upon the trooper's delivery of the citation, and return of the driver's license and registration," when the officer "completed all his duties pertaining to the traffic stop itself." *Id.* at 373, 735 A.2d 491. Therefore, the Court determined that the continued detention amounted to a second stop. It reasoned, at 355 Md. at 372, 735 A.2d 491:

> [t]he officer's purpose in an ordinary traffic stop is to enforce the laws of the roadway, and ordinarily to investigate the manner of driving with the intent to issue a citation or warning. Once the purpose of that stop has been fulfilled, the continued detention of the car and the occupants amounts to a second detention. *See Royer,* 460 U.S. at 500, 103 S.Ct. at 1325–26. Thus, once the underlying basis for the initial traffic stop has concluded, a police-driver encounter which implicates the Fourth Amendment is constitutionally permissible only if either (1) the driver consents to the continuing intrusion or (2) the officer has, at a minimum, a reasonable, articulable suspicion that criminal activity is afoot. *United States v. Sandoval,* 29 F.3d 537, 540 (10th Cir.1994).

Consequently, the Court proceeded to address the "more difficult question" of whether the officer's questioning of Ferris after his documents were returned and the citation was issued amounted to a detention or seizure under the Fourth Amendment or, instead, "a 'consensual encounter....' " *Id.* at 373, 735 A.2d 491. It defined a "consensual encounter" as the "voluntary cooperation of a private citizen in response to non-

coercive questioning by a law enforcement official. Because an individual is free to leave at any time during such an encounter, he is not 'seized' within the meaning of the [F]ourth [A]mendment." *Ferris,* 355 Md. at 373 n. 4, 735 A.2d 491. Moreover, the Court acknowledged that "[m]ere police questioning does not constitute a seizure." *Id.* at 374, 735 A.2d 491.

Nevertheless, the Court agreed with Ferris that what occurred after the completion of the traffic stop constituted a seizure, not a consensual encounter. *Id.* at 374, 735 A.2d 491. The Court reiterated that the "test to determine whether a particular encounter constitutes a seizure, or whether the encounter was simply a 'consensual' non-constitutional event is whether a reasonable person would have felt free to leave." *Id.* at 375, 735 A.2d 491. The Court focused on " 'whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.' " *Id.* at 376, 735 A.2d 491 (citation omitted). It added that a "key inquiry" concerns whether the conduct of the police " 'communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.' " *Id.* (citations omitted).

With respect to the question of whether a reasonable person in Ferris's situation would have felt " 'free to disregard the police presence and go about his business,' " *id.* at 376, 735 A.2d 491 (citation omitted), the Court regarded a "host" of factors as "significant." *Ferris,* 355 Md. at 378, 735 A.2d 491. The Court's analysis of these factors led it to conclude that the trooper's "prolonged encounter" with the defendant "was a seizure under the Fourth Amendment," *id.,* rather than a consensual stop.

Noting that the inquiry is "highly fact-specific," *id.* at 377, 735 A.2d 491, the Court articulated seven factors "probative of whether a reasonable person would have felt free to leave." *Id.* These included: 1) the time and place of the encounter; 2) the number of officers present and whether they were uniformed; 3) whether the police moved the person to a different

location or isolated him or her from others; 4) whether the person was informed that he or she was free to leave; 5) whether the police indicated that the person was suspected of a crime; 6) whether the police retained the person's documents; and 7) whether the police demonstrated any threatening behavior or physical contact to indicate to a reasonable person that he or she was not free to leave. *Id.*

"First and foremost," the Court pointed to the initial traffic stop, which the Court said "enhanced the coercive nature of the situation...." *Id.* at 378, 735 A.2d 491. In addition, the Court identified the following circumstances: the trooper failed to advise Ferris that he was free to leave; the trooper's request that Ferris exit the vehicle "seamlessly[ ] followed the pre-existing lawful detention," *id.;* the trooper removed Ferris from his automobile; the trooper separated Ferris from the passenger; there were two uniformed law enforcement officers present; the police cruiser emergency flashers remained operative throughout the entire encounter; and the incident occurred at 1:30 a.m. on a dark, rural interstate highway.

Concerning the trooper's failure to advise Ferris that he was free to leave, the Court observed that a defendant's knowledge of the right to withhold consent is a factor in analyzing "the voluntariness, and thus constitutional validity of a defendant's purported consent." *Ferris,* 355 Md. at 380, 735 A.2d 491 (citations omitted). Additionally, the Court pointed out that " 'a request that an individual move in some manner has been consistently regarded by this Court as persuasive evidence that a fourth amendment seizure has occurred.' " *Id.* at 383, 735 A.2d 491 (citation omitted). Moreover, in the Court's view, the record did not reveal a basis to find that "any legitimate law enforcement purpose which justified the initial detention was furthered by the removal of Ferris from his automobile." *Id.* at 383, 735 A.2d 491. The Court also said, *id.* at 382–83, 735 A.2d 491:

Finally, we note the geographic and temporal environment of the encounter: late at night on the side of a presumably desolate, rural interstate highway. The time and location of the encounter would have been unsettling to

a reasonable person in Ferris's position. Consequently, the physical environment of the encounter between Trooper Smith and Ferris heightened the coerciveness of the encounter.

Based on the "cumulative effect of these circumstances," *id.* at 379, 735 A.2d 491, the Court held that "a reasonable person in Ferris's position would not have believed that he was free to terminate the encounter . . . ." *Id.* at 379, 735 A.2d 491. To the contrary, the Court was of the view that a reasonable person would have believed he was "neither free to leave the scene nor to ignore and disobey the police officer's 'requests.'" *Ferris,* 355 Md. at 378, 735 A.2d 491. What the Court said is pertinent here:

> The pre-existing detention of Ferris, properly sustained by the probable cause for the speeding violation, combined with the other factors we have identified, leads to the conclusion that *a reasonable person in Ferris's position would believe that continued submission to Trooper Smith was required.* Although in this case Trooper Smith returned Ferris's driver's license and registration, that fact alone is not dispositive of whether the trooper's conduct was coercive. The moment at which a traffic stop concludes is often a difficult legal question, not readily discernible by a layperson. It is not sound to categorically impute to all drivers the constructive knowledge as to the precise moment at which, objectively, an initially lawful traffic stop terminates, *i.e.,* the time at which the driver may depart. *The trooper's immediate transition into the inquiry was so seamless that a reasonable motorist would not have believed that the initial, valid seizure had concluded.*

*Id.* at 379, 735 A.2d 491 (emphasis added).

Concluding that Ferris "was seized, for a second time, when he was asked to exit his car," *id.* at 384, 735 A.2d 491, the Court reasoned:

> We emphasize that, although, standing alone, no single circumstance would have transformed the encounter into a Fourth Amendment seizure, the collective coerciveness of

the totality of those circumstances rose to the level of a show of authority such that a reasonable person in Ferris's position would not have felt free to terminate the encounter with Trooper Smith at the moment the trooper asked him "if he would mind stepping to the back of his vehicle." Accordingly, we hold that Trooper Smith, having lawfully detained Ferris pursuant to a valid traffic stop, seized him within the meaning of the Fourth Amendment when, immediately after completing the traffic stop, he asked Ferris to get out of his car and began to question him about possible criminal activity unrelated to that which gave rise to the initial, completed traffic stop.

*Id.*

Because the trooper's continued detention exceeded the scope of the initial traffic stop, and constituted a second seizure for which there was no voluntary consent, the Court recognized that the second stop had to be supported by reasonable, articulable suspicion in order to be lawful. *Ferris,* 355 Md. at 384, 735 A.2d 491. The Court went on to conclude that there was no reasonable, articulable suspicion to support the continued detention, explaining: "The facts articulated by the trooper—that Ferris had exhibited extremely bloodshot eyes, nervousness, and a lack of odor of alcohol—are too weak, individually or in the aggregate, to justify reasonable suspicion of criminal activity." *Id.* at 387, 735 A.2d 491.

This Court's decision in *Charity,* 132 Md.App. 598, 753 A.2d 556, is also helpful. There, the Court considered the legality of a prolonged detention in conjunction with a traffic stop and an alleged consent to submit to a frisk. In its analysis, the Court noted that *Ferris* had addressed the voluntariness of an alleged consent to exit a car and submit to questioning; the Court considered that analysis "pertinent" to the issue of whether the defendant voluntarily consented to the frisk. *Id.* at 636, 753 A.2d 556.

Although the trial judge found the frisk consensual, as the State had argued, the Court determined that the consent was invalid, because it was obtained from the defendant during an

illegal second detention. *Charity,* 132 Md.App. at 633, 753 A.2d 556. What Judge Moylan said for the Court is pertinent here:

> If the consent were sought and given during a period of unconstitutional detention . . . that factor alone, absent attenuation between the initial taint and the presumptively poisoned fruit, would be dispositive that the consent was not voluntary. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).
>
> We have held that the appellant was being unconstitutionally detained at the time [the police officer] asked him to consent to a pat-down. That unconstitutional detention began when he was asked to get out of his vehicle in the rain and move to its rear. It continued as he was questioned by [the officer] as to where he had been and where he was going. It continued as [the officer] left him standing in the rain and went off to question the passenger as to where he had been and where he was going. It continued as [the officer] returned and sought the appellant's consent to the pat-down as, a necessary precondition for the appellant to be allowed to get out of the rain and to sit in the police cruiser. There was no attenuation between the tainted detention and the ostensible consent. The consent was the "fruit of the poisoned tree."

*Id.* at 634, 753 A.2d 556.

The Court also relied on the observations in *Ferris* regarding "the coercive effect" of "certain police actions . . . on the stopped motorist. . . ." *Id.* at 636, 753 A.2d 556. As the Court observed, "[t]he fact that the initial traffic-related '*Whren* stop' was legal does not mean that it could not have contributed to the coercive atmosphere of ensuing events," including a consent to search. *Id.*

Writing for this Court in *Carter v. State,* 143 Md.App. 670, 692, 795 A.2d 790 (2002), Judge Moylan recently underscored that, in contrast to a *Terry* stop, stricter time constraints apply to a routine traffic stop. In dicta, the *Carter* Court recognized that, with respect to a routine traffic stop, "[o]nce a

reasonable time for the processing of a traffic charge has expired, even a minimal further delay to accommodate the arrival of a drug-sniffing canine is not permitted," unless grounds for a *Terry* stop emerge during the traffic stop. *Id.* at 692, 795 A.2d 790 (citing *Graham v. State*, 119 Md.App. 444, 469, 705 A.2d 82 (1998)). The Court said: "Once the purpose of the traffic stop has been fully and reasonably served, no further detention is permitted—unless, in the course of the traffic stop, some independent articulable or reasonable suspicion has arisen to create some new and self-sufficient investigative purpose." *Carter*, 143 Md.App. at 693, 795 A.2d 790; *see Graham*, 119 Md.App. at 469, 705 A.2d 82.

We are further guided by *Pryor v. State*, 122 Md.App. 671, 716 A.2d 338 (1998). There, we held unconstitutional a "detention that extended beyond the period of time that it would reasonably have taken for a uniformed officer to go through the procedure involved in issuing a citation to a motorist." *Id.* at 682, 716 A.2d 338. Although the initial traffic stop was lawful, and the officer had articulable suspicion to support a *Terry* stop, Chief Judge Murphy, writing for the Court, held that the length of the stop, some twenty to twenty-five minutes in duration, could not be justified on the ground that the police were awaiting a drug-sniffing dog. *Id.*

*Whitehead v. State*, 116 Md.App. 497, 698 A.2d 1115, *cert. denied*, 348 Md. 207, 703 A.2d 148 (1997), is also noteworthy. In that case, after the defendant was stopped for speeding, the police verified that his documents were in order, there were no warrants for his arrest, and the car was not stolen. Nevertheless, the police did not terminate the traffic stop. Instead, the defendant was detained pending the arrival of a K–9 unit. We reversed. Writing for the Court, Judge Sonner said:

> The detention in *Whren* that the Supreme Court approved was brief, and the arrest for violation of the narcotics laws instantaneously followed the stop. We think it would be a mistake to read *Whren* as allowing law enforcement officers to detain on the pretext of issuing a traffic citation or warning, and then deliberately to engage in activities not related to the enforcement of the traffic code in order to

determine whether there are sufficient indicia of some illegal activity. Stopping a car for speeding does not confer the right to abandon or never begin to take action related to the traffic laws and, instead, to attempt to secure a waiver of Fourth Amendment rights from a citizen whose only offense to that point is to have been selected from among many who have been detected violating a traffic regulation. An interpretation of *Whren* that is consistent with *Snow* and *Munafo* requires the police to issue the citation or warning efficiently and expeditiously with a minimum of intrusion, only that which is required to carry forth the legitimate, although pretextual, purpose for the stop. *We are condemning not the stop itself, but the detention after the pretextual stop that was for the purpose of determining whether the trooper could acquire sufficient probable cause or a waiver that would permit him to search the car for illegal narcotics.*

*Id.* at 506–07, 698 A.2d 1115 (emphasis added).

*Munafo*, 105 Md.App. 662, 660 A.2d 1068, is also instructive. In that case, the driver of a motor vehicle was stopped by the police because of several traffic violations. Although Munafo conceded that the initial traffic stop was legal, he maintained that he was subjected to an illegal "second stop," *id.* at 669, 660 A.2d 1068, unsupported by reasonable suspicion. *Id.* at 669–70, 660 A.2d 1068. Because the officer harbored no more than a "hunch" that Munafo possessed contraband, we concluded that the trial court erred in denying the motion to suppress the drugs seized from the console of the car. *Id.* at 676, 660 A.2d 1068. We explained:

[T]he purpose of a traffic stop is to issue a citation or warning. Once that purpose has been satisfied, the continued detention of a vehicle and its occupant(s) constitutes a second stop, and must be independently justified by reasonable suspicion.

*Id.* at 670, 660 A.2d 1068; *see also Snow v. State,* 84 Md.App. 243, 578 A.2d 816 (1990).

## IV.

Appellant vigorously denied having consented to the vehicle search, but the suppression court found as a fact that appellant consented and never withdrew that consent. In making its first level factual findings, the judge did not expressly determine whether the deputy's conduct amounted to a second detention, nor did it discuss the factors identified in *Ferris.* Rather, it merely credited the deputy's version of events as to consent, noting that Green was significantly larger than the officer, he was not "bashful," and felt so unthreatened by the officer's conduct during the initial car search that he suggested "prolonging" the search "by inviting" the deputy to search the trunk.

Although we accept the circuit court's first level finding that the appellant "consented" to the search, we must independently determine the voluntariness of that consent, in light of the character of the encounter that culminated in that consent. The threshold question is whether the continued encounter after the completion of the traffic stop constituted a suspicionless seizure under Fourth Amendment law or, instead, a consensual encounter. A consent to search procured during an illegal detention is invalid as the product of the illegal seizure—the so called fruit of the poisonous tree. *See Royer,* 460 U.S. at 507–08, 103 S.Ct. 1319 ("The consent was tainted by the illegality and … ineffective to justify the search"); *Charity,* 132 Md.App. at 634, 753 A.2d 556.

The State and appellant discuss the issues in the context of two encounters: the traffic stop and the prolonged period after the traffic stop. Appellant argues that, even though he was found to have consented to the search, he did not consent to a search to be conducted about thirty minutes later. In other words, he claims that the delay in conducting the search vitiated his consent. In contrast, the State argues that appellant's consent remained in effect throughout the time that appellant and the deputy waited for the arrival of the back-up unit, because appellant failed to expressly revoke his consent.

To be sure, this case presents a clear point of demarcation at which the traffic stop came to an end and the next police encounter began. The encounter that followed the traffic stop can be considered as if it were one long encounter, as the parties have suggested. Analytically, however, we shall divide the post-traffic stop encounter into two discrete components. In doing so, we shall refer to a total of three encounters and two car searches. The second encounter followed on the heels of the traffic stop, as the parties recognize. That encounter included the first car search. The third encounter began after the deputy frisked appellant and completed his initial search of the vehicle.

The legality of the second stop is arguably a close question. We need not resolve whether it was a lawful consensual encounter, however, because we regard the third detention as illegal, and it was during that detention that the second car search occurred.

■ In reaching our conclusion that the third detention and second car search were illegal, we have considered the totality of all the circumstances, from the beginning of the traffic stop until the second vehicle search. In doing so, we rely on *Ferris* and its progeny; *Ferris* analyzed the legality of the detention beginning with the initial traffic stop. In our view, a reasonable person in Green's situation would not have believed that he was free to terminate the third encounter, during which the second car search occurred. We explain.

■ The traffic stop terminated just after 7:30 p.m., when the deputy claimed that he returned appellant's license and registration and tendered the warning to him. At that point, the purpose of the traffic stop was satisfied. *See Charity*, 132 Md.App. at 613, 753 A.2d 556. Therefore, "the initial traffic stop could no longer serve as the Fourth Amendment justification for anything that followed." *Id.* According to the State, however, appellant voluntarily consented to the deputy's request to answer questions, and then agreed to submit to the frisk and car search.

The State does not claim that the stop was prolonged based on reasonable, articulable suspicion of wrongdoing by appellant, as embodied in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny. That fact is significant to our analysis; absent reasonable suspicion, even a reasonable delay would not have been permitted, unless appellant voluntarily consented. *See Ferris,* 355 Md. at 372, 735 A.2d 491; *Carter,* 143 Md.App. at 693, 795 A.2d 790; *Charity,* 132 Md.App. at 612–13, 753 A.2d 556. Moreover, if the continued detention was unlawful, any consent procured during that time would be tainted.

With respect to the Deputy's request at the end of the traffic stop to question appellant, Green said, "sure." He again responded "sure" as to the request to search. But, a defendant's utterance of consensual words does not necessarily render a statement voluntary for Fourth Amendment purposes. The statement must be considered in light of the circumstances. In *Ferris,* for example, the defendant was asked if he would mind stepping to the back of the car to answer questions, and the defendant said he "didn't mind." That statement is akin to Green's responses of "sure." Yet, as we explained at length, the Court in *Ferris* did not consider the defendant's statement as voluntary.

The State maintains that when the deputy asked Green to answer questions, this did not amount to improper conduct. It notes that when an officer poses questions to an individual, it does not necessarily amount to a seizure. In general, we agree. *See Drayton,* —— U.S. ——, 122 S.Ct. 2105, 2110, ("Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen"); *Scott v. State,* 366 Md. 121, 133, 782 A.2d 862 (2001); *Ferris,* 355 Md. at 374, 735 A.2d 491; *Trott v. State,* 138 Md.App. 89, 98–100, 770 A.2d 1045 (2001). Nevertheless, the questions were posed at the end of the traffic stop, and that stop was a seizure, with a "coercive atmosphere" attend-

ant to it. *Charity*, 132 Md.App. at 613, 753 A.2d 556. Nor was there a "clear dissipation of that atmosphere." *Id.* To the contrary, the deputy immediately and "seamlessly" asked appellant to submit to questions.

Further, the deputy did not tell Green that he could decline to answer the deputy's questions, refuse to submit to the frisk, withhold consent to the first or second vehicle search, or leave the scene, rather than continue to wait for the arrival of a back-up unit. An officer's failure to advise of the right to refuse consent is a relevant factor in the voluntariness analysis, although it is not determinative. *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996); *Ferris*, 355 Md. at 380, 735 A.2d 491. As the Supreme Court said in *Drayton*, "The Court has rejected in specific terms the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search." —— U.S. at ——, 122 S.Ct. at 2113, . But, it reiterated that " 'knowledge of the right to refuse consent is one factor to be taken into account ...' " in determining voluntariness. *Id.* at ——, 122 S.Ct. at 2113 (citation omitted). The Court added that "the totality of circumstances must control, without giving extra weight to the absence of this type of warning." *Id.*

The deputy testified that, as soon as Green consented to the frisk and the car search, he called for back-up. Once the back-up unit was called, a reasonable person in Green's situation would not have believed he could terminate the encounter. Moreover, while waiting for the back-up, the deputy inspected Green's vehicle. The deputy testified: "I visually checked the open areas in plain view." As we see it, even if appellant had voluntarily consented to a car search, the consent applied to the search that promptly followed the consent. When that search was completed, the second encounter came to an end; appellant never consented to a continued encounter or to a second car search. Nor did Green agree to a search that depended upon the arrival of a back-up unit. Indeed, there was no evidence that Green consented to

wait some fifteen or twenty minutes for the arrival of the back-up unit, so that a more comprehensive vehicle search could be performed.

The State has not provided us with any authority to suggest that the consent provided by appellant at the end of the routine traffic stop was open ended, with no temporal limitations. There was no evidence, as we said, that appellant agreed to such a protracted detention. *See Maine v. Faulkner*, 586 A.2d 1246, 1248 (Maine 1991) (recognizing that "consent search is legal only to the extent of the consent," and upholding "pat-down search" on ground that it did not exceed scope of voluntary consent); *North Carolina v. Williams*, 67 N.C.App. 519, 313 S.E.2d 236, 237 (1984), *cert. denied*, 311 N.C. 308, 317 S.E.2d 909 (N.C.1984) (recognizing that the "temporal scope of a consent to search is a question of fact to be determined in light of all the circumstances," and upholding written consent to vehicle search conducted 23 hours after consent was executed).

In *Gray, supra*, 441 A.2d 209, the Supreme Court of Delaware reviewed, *inter alia*, the legality of a consent search to locate a watch belonging to a murder victim. One of the murder suspects executed a written consent authorizing the Delaware police to make a search of the defendant's belongings, which were in the custody of the Philadelphia authorities. In particular, the court considered whether the consent "lapsed" because of a delay of twenty hours between the consent, signed at 4:00 p.m., and the search, executed two hours after the police arrived in Philadelphia at 10:00 a.m. the next day. The court noted that "a consent to search does not mean the constitutional protection against unreasonable searches and seizures has been waived for all time and for all things." *Id.* at 221. Recognizing that the question of how long a consent lasts depends on the facts of each case, the court said: "The length of time a consent lasts depends upon the reasonableness of the lapse of time between the consent and the search in relation to the scope and breadth of the consent given.... [I]f the search takes place within a reasonable time as to consent ... a mere change of mind will not

render the search violative of a defendant's Fourth Amendment rights." *Id.*

The Delaware court reasoned that the defendant voluntarily executed a written consent to search that was limited to the watch, and the police did not exceed the limited scope of the consent. Moreover, the court noted that the police did not proceed to Philadelphia immediately upon obtaining a consent, because they knew the watch was safe. Additionally, the defendant saw the watch as it was turned over to the Delaware police and never objected. The limited nature of the search, conducted in strict accordance with the scope of the consent, led the court to uphold it. *Id.* at 222.

Other factors, in accordance with the factors considered in *Ferris*, are also relevant here, under our totality of circumstances analysis. For example, although the deputy never told appellant that he was under investigation for criminal misconduct, calling for back-up would generally signal to a reasonable person that the continuation of the encounter is not really a matter of choice. Significantly, Corporal Riggleman's acknowledgment in his testimony that he was at the scene to make sure Green did not flee belies the State's assertion that appellant remained at the scene voluntarily, or that appellant was free to terminate the encounter.

We also note that the deputy asked appellant to step out of the vehicle. Certainly, the deputy was entitled to order appellant out of the car as an incident of the traffic stop. *Maryland v. Wilson*, 519 U.S. 408, 411–12, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997). Nevertheless, Green was not asked or told to exit his car until after the traffic stop was over. As the *Ferris* Court observed, when an individual is asked to move, it is probative of a Fourth Amendment seizure. Moreover, *Ferris* considered the coercive effect of police conduct when the police separate one individual from his or her companions during a traffic stop. Yet, in our view, there may be some emotional strength derived from having companions during a traffic stop, even if one is separated from them. Cf. *Drayton*, —— U.S. at ——, 122 S.Ct. 2105, 2112 (involving questioning

and searching of passengers on bus; "because many fellow passengers are present to witness officers' conduct, a reasonable person may feel even more secure in his or her decision not to cooperate with police....") In contrast, appellant was all alone on a dark road with an armed trooper; that circumstance seems at least as coercive as the one in *Ferris*.

The conditions at the time of the stop are also important. Although the events in this case did not occur in the early morning hours, as in *Ferris,* there is no question that it was dark when the stop occurred. Indeed, the deputy expressed concern for his own safety because of the conditions. Meil specifically said he was "worried," and called for back up, in part because of the "area and location" of the stop and because it was "extremely dark out." As we see it, those factors are equally relevant in assessing whether appellant would reasonably have believed he was free to terminate the encounter.

The trial court considered it significant that Green asked Meil whether the deputy wanted to look in the trunk. Appellant's inquiry came during the period that we have referred to as the second encounter. We do not consider that inquiry dispositive as to the voluntariness of the consent during the third encounter. In any event, Green's inquiry was consistent with the cooperative conduct that he displayed, but does not signify that he believed he was free to terminate the encounter. Indeed, appellant's inquiry, a sign of his cooperation, may even have been a product of the coercive circumstances. *Cf. Drayton,* —— U.S. at ——, 122 S.Ct. 2105, 2110 (recognizing that officers may pose questions and request consent to search, even without particular suspicion, "provided they do not induce cooperation by coercive means.")

The circuit court's reliance on appellant's size is equally unpersuasive as to voluntariness. The record is not clear as to the comparative sizes of appellant and the trooper. What is clear, however, is that it was the trooper who was armed, although his weapon was not drawn.

Our research has uncovered a recent New Jersey decision concerning a traffic stop and consent search that is illuminating in the context of this case. In *New Jersey v. Carty*, 170 N.J. 632, 790 A.2d 903 (2002), the New Jersey Supreme Court addressed the legality under New Jersey constitutional law of a consensual search following a lawful traffic stop; during the search, drugs were recovered from the vehicle. As in this case, the police in *Carty* had no articulable suspicion to continue the detention after the completion of the traffic stop. The New Jersey court held that, "in order for a consent to search a motor vehicle and its occupants to be valid, law enforcement personnel must have a reasonable and articulable suspicion of criminal wrongdoing prior to seeking consent to search a lawfully stopped motor vehicle." *Id.* at 905. The court considered that its holding "serves the prophylactic purpose of preventing the police from turning routine traffic stops into a fishing expedition for criminal activity unrelated to the lawful stop." *Id.*

In reaching its conclusion, the court criticized as "problematic," *id.* at 909, the "standardless" way in which "consent" searches are made of persons who are lawfully stopped for minor traffic violations. *Id.* at 908. The court remarked that "[r]oadside consent searches are ... akin to an investigatory stop that does not involve a detention," *id.* at 908, observing that such stops have "traditionally ... required reasonable and articulable suspicion." *Id.* Moreover, the court indicated its concern as to the frequency with which requests to consent to a car search are "likely to be complied with." *Id.* at 912. Indeed, it recognized that many people subjected to such requests believe they have no choice but to consent. *Id.* at 910.

Although the *Carty* decision is premised on New Jersey constitutional law, the court noted that the "reasonable and articulable suspicion standard is a well-established constitutional requirement under the Fourth Amendment...." *Id.* at 914. In its view, "[c]onsent that is the product of official intimidation or harassment is not consent at all." *Id.* at 911 (quoting *Florida v. Bostick*, 501 U.S. at 438, 111 S.Ct. 2382,

115 L.Ed.2d 389 (1991).) The court said: " 'Citizens do not forfeit their constitutional rights when they are coerced to comply with a request that they would prefer to refuse.' " *Id.* (*quoting Florida v. Bostick,* 501 U.S. at 438, 111 S.Ct. 2382.) Accordingly, the court ruled that a "suspicionless consent search" is unconstitutional when it is conducted in connection with a routine traffic stop. *Id.* at 912. Absent a reasonable and articulable basis "to continue the detention after completion of the valid traffic stop," *id.,* the court held that continued "detention to effectuate a consent search is unconstitutional." *Id.*[1]

Several other jurisdictions have reached similar results. *See,* e.g., *United States v. Valadez,* 267 F.3d 395 (5th Cir.2001) (concluding that defendant was illegally subjected to continued detention after officer confirmed that defendant had not committed traffic violation and there was no reasonable suspicion of other wrongdoing); *United States v. Jones,* 234 F.3d 234 (5th Cir.2000) (holding unreasonable the continued detention of the defendant after completion of valid traffic stop, and concluding that subsequent consent to search did not dissipate Fourth Amendment violation); *People v. Brownlee,* 186 Ill.2d 501, 239 Ill.Dec. 25, 713 N.E.2d 556 (1999) (finding that officers' actions after conclusion of traffic stop amounted to show of authority and a reasonable person would not have concluded that he was free to leave); *State v. Robinette,* 80 Ohio St.3d 234, 685 N.E.2d 762 (1997) (finding consent to search involuntary and the fruit of an illegal detention under Ohio constitution, because there was no justification to continue the detention after police issued warning for speeding).

## CONCLUSION

In our view, the legality of the prolonged detention, without any reasonable suspicion of wrongdoing on the part of Green, must be considered in light of the strict time constraints that govern a routine traffic stop. We are unable to say, based on the totality of all the circumstances, that appellant voluntarily consented to the third encounter or the second vehicle search.

At the most, Green's consent would have been limited to the second encounter, which was the period encompassing the questioning, frisk, and first car search. That consent, by Meil's own testimony, was given before the deputy called for back-up. Once the back-up unit was called, the stakes were clearly raised, and a reasonable person would not have believed he or she could terminate the encounter. Nor is there any evidence that appellant's consent embraced the period of approximately fifteen to twenty minutes after the first car search, while Green and the deputy awaited the arrival of the back-up unit, or a total period of about thirty minutes, from the end of the traffic stop to the commencement of the second car search.

We conclude that the second vehicle search occurred well beyond the period of any consent that appellant may have given. In other words, appellant did not consent to a search that occurred about thirty minutes after the end of the traffic stop. Therefore, the extended detention was unlawful, and the search exceeded the temporal scope of appellant's consent. Because the second car search occurred during an illegal detention, the court erred in denying the suppression motion.

**JUDGMENTS VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR QUEEN ANNE'S COUNTY FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY QUEEN ANNE'S COUNTY.**

Dissenting Opinion by EYLER, JAMES R., J.

As does the majority, I accept the trial court's resolution of the credibility issues. This includes the finding that appellant consented to the search in question.

With respect to this Court's independent constitutional appraisal, I agree with the majority that there was a valid traffic stop which was completed when the officer issued a warning citation and returned appellant's driver's license and vehicle registration. In my view, however, there was no subsequent seizure but rather a consensual encounter. *See U.S. v. Drayton,* —— U.S. ——, 122 S.Ct. 2105. Consequently, we are not

faced with the question of the validity of consent given during an illegal stop or seizure.

In the case before us, there was one officer; appellant was advised that he was free to go after his documents had been returned to him; and appellant consented while he was in his vehicle, before the officer called for backup, thus consenting prior to any action by the officer. There was no coercive behavior, and the consent was never withdrawn.

I would affirm.